RANDALL ET AL. *v.* LOFTSGAARDEN ET AL.

No. 85–519.   Argued April 2, 1986—Decided July 2, 1986

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, MARSHALL, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 667. BRENNAN, J., filed a dissenting opinion, *post*, p. 670.

*Robert Arthur Brunig* argued the cause for petitioners. With him on the brief were *Terence M. Fruth* and *Ted S. Meikle.*

*Deputy Solicitor General Wallace* argued the cause for the United States et al. as *amici curiae* urging reversal. With him on the brief were *Solicitor General Fried, Acting Assistant Attorney General Olsen, Albert G. Lauber, Jr., Ann Belanger Durney, Teresa E. McLaughlin, Daniel L. Goelzer, Paul Gonson, Jacob H. Stillman, Richard A. Kirby,* and *Martha H. McNeely.*

*John M. Friedman, Jr.,* argued the cause and filed a brief for respondents.*

JUSTICE O'CONNOR delivered the opinion of the Court.

The question presented is whether the recovery available to a defrauded tax shelter investor, entitled under § 12(2) of the Securities Act of 1933 or § 10(b) of the Securities Exchange Act of 1934 to rescind the fraudulent transaction or obtain rescissory damages, must be reduced by any tax benefits the investor has received from the tax shelter investment.

_____

*Lowell E. Sachnoff* and *William Gleeson* filed a brief for Hon Industries, Inc., as *amicus curiae* urging reversal.

*Edward Brodsky* and *Thomas H. Sear* filed a brief for Envitex Realty Corp. as *amicus curiae* urging affirmance.

I

In 1973, petitioners purchased interests in Alotel Associates (Associates), a limited partnership organized by respondent B. J. Loftsgaarden to build and operate a motel in Rochester, Minnesota. Loftsgaarden was the president and sole shareholder of respondent Alotel, Inc. (Alotel), which, together with Loftsgaarden, was to be a general partner in the venture.

Loftsgaarden marketed this $3.5 million project as a "tax shelter," which would result in "'significantly greater returns for persons in relatively high income tax brackets.'" *Austin* v. *Loftsgaarden*, 675 F. 2d 168, 173 (CA8 1982) *(Austin I)*. As a partnership, Associates would not be taxed as an entity. Rather, its taxable income and losses would pass through to the limited partners, who would then be entitled to claim their individual shares of the partnership's deductible losses to the extent of their adjusted basis in their partnership interests. 26 U. S. C. § 704(d). Especially attractive from the high-income investor's perspective was the fact that "in a real estate investment such as the one contemplated by Loftsgaarden, the limited partner's basis is not restricted to the amount of his actual investment (the amount 'at risk'); rather, it may be increased by the partner's proportional share of any nonrecourse loans made to the partnership." 675 F. 2d, at 173. See 26 U. S. C. § 465(c)(3)(D). Consequently, the individual limited partner may be able to claim deductible partnership losses in amounts greatly in excess of the funds invested, and offset those losses against other income.

The initial offering memorandum indicated that Associates would employ financing techniques designed to provide large and immediate tax savings to the limited partners: a non-recourse loan would finance the bulk of the project, and rapid depreciation methods would be used to throw off large initial losses. Nonetheless, the initial offering was unsuccessful, and Loftsgaarden revised the plan and the offering memo-

randum to propose that Associates would rent land instead of purchasing it, thereby incurring another deductible expense. Petitioners subscribed to the second offering, investing from $35,000 to $52,500 each. Associates soon began to experience financial difficulties, and in February 1975 Loftsgaarden asked the limited partners to make additional loans to Associates; they complied, but initiated an investigation into the partnership. Associates eventually defaulted on its obligations, and in 1978 the motel was foreclosed on by its creditors.

Petitioners brought suit in the District Court in 1976, alleging securities fraud and raising federal claims under § 12(2) of the Securities Act of 1933, 48 Stat. 84, as amended, 15 U. S. C. § 77*l*(2), § 10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, 15 U. S. C. § 78j(b), and SEC Rule 10b–5, 17 CFR 240.10b–5 (1985), as well as pendent state law claims. The jury found that respondents had knowingly made material misrepresentations and omissions in the revised offering memorandum, and that petitioners had reasonably relied on these material misstatements, which caused their damages. Among other misstatements, respondents had mischaracterized the financing available, the terms of the land lease, and the manner and extent of their compensation for services rendered. These findings made respondents liable under § 10(b), Rule 10b–5, and state law. The District Court also accepted the jury's advisory verdict that respondents were liable under § 12(2) for knowingly making material misrepresentations and omissions in the offering memorandum which induced their purchases. App. to Pet. for Cert. E–1.

Finding that petitioners' investments were worthless by the time they discovered the fraud in 1975, the District Court held that the remedy of rescission was proper under § 12(2), which provides that an investor harmed by prospectus fraud may sue "to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if

he no longer owns the security." 15 U. S. C. § 77*l*(2). Rescission was permissible, the court ruled, notwithstanding that petitioners had not made a tender of their securities to respondents until shortly before trial. App. to Pet. for Cert. E–15. Accordingly, the District Court entered judgment for petitioners in the amount of the consideration paid for the limited partnership units, together with prejudgment interest; it also noted that each of the counts found by the jury would independently support respondents' liability, but that "each plaintiff is entitled only to a single recovery." *Id.*, at E–16. The District Court rejected respondents' contention that petitioners' recovery should be offset by tax benefits received, concluding that "[a]bsent [respondents'] fraud, which induced their purchases, [petitioners] would probably have made other investments which produced temporary tax savings, but without the total loss of their investment." *Id.*, at F–9–F–10.

A panel of the Court of Appeals for the Eighth Circuit sustained respondents' liability under § 12(2) and § 10(b), but reversed the rescissory award and remanded for a new trial on that issue. The panel rejected respondents' claim that petitioners were not entitled to rescission under § 12(2) because they had made no tender of their partnership interests until shortly before trial, 675 F. 2d, at 179, agreeing with the District Court's "decision to apply what was essentially a rescissory measure of damages in this case." *Id.*, at 181. The panel held, however, that the District Court had erred in refusing to reduce "the damage award" by an amount equal to any tax benefits received by petitioners "on account of the investment." *Ibid.*

In the panel's view, an "actual damages principle," applicable both to § 12(2) and § 10(b), required that an award of rescission or of rescissory damages be "'reduced by any value received as a result of the fraudulent transaction.'" *Id.*, at 181 (quoting *Garnatz* v. *Stifel, Nicolaus & Co.*, 559 F. 2d 1357, 1361 (CA8 1977), cert. denied, 435 U. S. 951 (1978)).

The panel observed that the benefits anticipated from a successful real estate tax shelter typically include tax savings to the limited partner in the early years, followed by income in later years, and reasoned that "unlike a corporate shareholder, . . . even if the enterprise fails to become profitable, the limited partner clearly may have something of value because of the investment's unique tax treatment." 675 F. 2d, at 182. In light of "the value of the tax deductions generated by such an investment," the panel held that "the strictly compensatory nature of damages awardable in private securities fraud actions requires that such value be taken into account in determining whether and to what extent damages were inflicted upon plaintiffs." *Id.*, at 183. Finally, the panel rejected petitioners' objection that "because there are tax consequences to any investment one makes, evidence of those consequences will now figure in every securities fraud case," and asserted that its holding was limited to "cases involving investments that are expressly marketed and sold as tax shelters." *Ibid.*

On remand, the District Court held a bench trial on the issue of tax benefits, and calculated each petitioner's damages as the purchase price of his partnership interest plus simple interest, minus net tax benefits. App. to Pet. for Cert. C–5. Both petitioners and respondents appealed from the District Court's judgment, and, after a second panel ruled on various subsidiary issues, the Court of Appeals reconsidered the case en banc. *Austin* v. *Loftsgaarden*, 768 F. 2d 949 (CA8 1985) *(Austin II)*.

Relying in part on the law of the case, and noting that the Second Circuit had reached a similar result in *Salcer* v. *Envicon Equities Corp.*, 744 F. 2d 935 (1984), vacated and remanded, *post*, p. 1015, the Court of Appeals adhered to the *Austin I* panel's holding that an award of rescission or of rescissory damages to a defrauded tax shelter investor should be reduced by any tax benefits actually received. This offset, moreover, was required whether the award stemmed

from liability under § 10(b) or § 12(2).   768 F. 2d, at 953–954. As to § 10(b), the Court of Appeals relied on § 28(a) of the 1934 Act, which provides that "no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of."   15 U. S. C. § 78bb(a). As to § 12(2), the court acknowledged that "the words 'actual damages' do not appear in the 1933 Act," but suggested that the rescission remedy provided by § 12(2) had been, and should be, construed as

> "substantially equivalent to the damages permitted under section 28(a).   Cf. *Affiliated Ute Citizens* v. *United States,* 406 U. S. 128, 155 (1972). . . . The goal of rescission under section 12(2) is to return the parties to the status quo *ante,* 'and hence a plaintiff can recover no more than his or her "net economic loss,"' *i. e.,* 'actual damages.'"   768 F. 2d, at 954 (quoting *Salcer, supra,* at 940).

Although the Court of Appeals recognized that "tax benefits received" are not "a form of income in a strict accounting sense," 768 F. 2d, at 955, it nonetheless concluded, in light of its interpretation of § 28(a) and of the purposes of the rescission remedy, that tax benefits are "income received" within the meaning of § 12(2).   768 F. 2d, at 954–955.

The Court of Appeals then proceeded to engage in a detailed analysis of the manner in which petitioners' rescissory damages should be determined.   The court ruled that prejudgment interest should not have been based on the total consideration paid by each petitioner, but rather on the amount by which each was "'out-of-pocket' during each year of the investment." *Id.,* at 958.   The court then determined that under its theory the tax consequences flowing from petitioners' recovery of damages, as well as the tax benefits themselves, should be taken into account in determining damages. Accordingly, it doubled the total damages award, including

prejudgment interest, to reflect the fact that each petitioner was in the 50% income tax bracket. *Id.*, at 960–961. The combined effect of the *Austin II* court's several rulings was this: under the rescissory approach originally employed by the District Court, petitioners would have been entitled to total recoveries ranging from $64,610 to $96,385, App. to Pet. for Cert. B–1—B–2; under the Court of Appeals' final ruling, petitioners could recover only amounts ranging from $506 to $7,666. 768 F. 2d, at 961.

Two judges dissented from the Court of Appeals' adherence to the panel's holding in *Austin I.* In their view, tax benefits could not plausibly be viewed as "income received" within the meaning of § 12(2), and the effect of allowing a tax benefit offset was to provide "a windfall to the defendant — the fraudulent party." 768 F. 2d, at 963 (Lay, C. J., dissenting). We granted certiorari because of the question's importance to the administration of the federal tax and securities laws, and because the Courts of Appeals are divided in their treatment of tax benefits for purposes of calculating damages in federal securities fraud litigation. 474 U. S. 978 (1985). See *Burgess* v. *Premier Corp.*, 727 F. 2d 826, 838 (CA9 1984) (refusing to reduce damages by tax benefits received in an action under § 10(b)). We now reverse.

## II

Section 12(2) specifies the conduct that gives rise to liability for prospectus fraud and expressly creates a private right of action in favor of the defrauded investor, who "may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." 15 U. S. C. § 77*l*(2). Thus, § 12(2) prescribes the remedy of rescission except where the plaintiff no longer owns the security. See *Wigand* v. *Flo-Tek, Inc.*, 609 F. 2d 1028, 1035 (CA2 1979). Even in

the latter situation, we may assume that a rescissory measure of damages will be employed; the plaintiff is entitled to a return of the consideration paid, reduced by the amount realized when he sold the security and by any "income received" on the security. See H. R. Rep. No. 85, 73d Cong., 1st Sess., 9 (1933) (under § 12, the buyer can "sue for recovery of his purchase price, or for damages not exceeding such price"); L. Loss, Fundamentals of Securities Regulation 1020 (1983) (hereinafter Loss) ("[W]hen the plaintiff in § 12 no longer owns the security, damages are to be measured so as to result in the substantial equivalent of rescission").

Petitioners contend that § 12(2)'s "income received" language clearly excludes tax benefits received pursuant to a tax shelter investment because tax benefits are not "a form of income in a strict accounting sense," *Austin II*, 768 F. 2d, at 955 (footnote omitted), and are not taxed as such. Accordingly, petitioners argue that tax benefits cannot offset a rescissory award under § 12(2).

Here, as in other contexts, the starting point in construing a statute is the language of the statute itself. *E. g.*, *Santa Fe Industries, Inc.* v. *Green*, 430 U. S. 462, 477 (1977). Moreover, "if the language of a provision of the securities laws is sufficiently clear in its context and not at odds with the legislative history, it is unnecessary 'to examine the additional considerations of "policy" . . . that may have influenced the lawmakers in their formulation of the statute.'" *Aaron* v. *SEC*, 446 U. S. 680, 695 (1980) (quoting *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 214, n. 33 (1976)). Section 12(2), we think, speaks with the clarity necessary to invoke this "plain language" canon: § 12(2)'s offset for "income received" on the security does not encompass the tax benefits received by defrauded investors by virtue of their ownership of the security, because such benefits cannot, under any reasonable definition, be termed "income."

The tax benefits attributable to ownership of a security initially take the form of tax deductions or tax credits. These

have no value in themselves; the economic benefit to the investor—the true "tax benefit"—arises because the investor may offset tax deductions *against* income received from other sources or use tax credits to reduce the taxes otherwise payable on account of such income. Unlike payments in cash or property received by virtue of ownership of a security—such as distributions or dividends on stock, interest on bonds, or a limited partner's distributive share of the partnership's capital gains or profits—the "receipt" of tax deductions or credits is not itself a taxable event, for the investor has received no money or other "income" within the meaning of the Internal Revenue Code. See 26 U. S. C. § 61. Thus, we would require compelling evidence before imputing to Congress an intent to describe the tax benefits an investor derives from tax deductions or credits attributable to ownership of a security as "income received thereon."

This Court's decision in *United Housing Foundation, Inc.* v. *Forman*, 421 U. S. 837 (1975), lends additional support to our conclusion that the economic value of tax deductions and tax credits in the hands of a particular investor is not "income received" on a security for purposes of § 12(2). In *Forman*, the Court rejected a claim that shares in certain housing projects must be deemed to be "securities" because of "the deductibility for tax purposes of the portion of the monthly rental charge applied to interest on the mortgage," which was said to constitute "an expectation of 'income.'" *Id.*, at 854–855. To the contrary, the Court found "no basis in law for the view that the payment of interest, with its consequent deductibility for tax purposes, constitutes income or profits." *Id.*, at 855. In this case, we reject the analogous suggestion that the tax deductions petitioners were entitled to take by virtue of their partnership interests "constitut[e] income or profits." *Ibid.*

Respondents have produced no specific evidence from the sparse legislative history of § 12(2) to establish that Congress intended tax benefits to be treated as "income received."

Instead, respondents urge that we look to the nature of the equitable remedy of rescission, which they say is exclusively "an effort to restore the *status quo ante.*" Brief for Respondents 27. Under this interpretation of rescission, respondents maintain, "'any person demanding the rescission of a contract to which he is a party must restore or offer to restore to the other party whatever he may have received under the contract in the way of money, property, or other consideration or benefit.'" *Ibid.* (quoting 2 H. Black, Rescission of Contracts and Cancellation of Written Instruments § 617, p. 1417 (1916)). Petitioners' tax benefits, respondents argue, constitute such "consideration or benefit."

Generalities such as these—which come to us unsupported by any instance in which a common law court treated tax benefits as consideration or property that must be returned or offset against the plaintiff's recovery in rescission—fall far short of the showing required to overcome the plain language of § 12(2). Moreover, even at common law, it is quite likely that tax benefits would be ignored for purposes of a rescissory remedy. Under the "direct product" rule, the party seeking rescission was required to credit the party against whom rescission was sought only with gains that were the "direct product" of the property the plaintiff had acquired under the transaction to be rescinded: "The phrase 'direct product' means that which is derived from the ownership or possession of the property without the intervention of an independent transaction by the possessor." Restatement of Restitution § 157, Comment *b* (1937). We agree with *amici*, the United States and the Securities and Exchange Commission, that tax benefits, because they accrue only if the tax deductions or credits the investment throws off are *combined* with income generated by the investor or taxes owed on such income, would in all likelihood not have been deemed a "direct product" of the security at common law. See Brief for United States and SEC as *Amici Curiae* 13. Cf. *Cereal Byproducts Co.* v. *Hall*, 16 Ill. App. 2d 79, 147 N. E. 2d 383,

aff'd, 15 Ill. 2d 313, 155 N. E. 2d 14 (1958) (refusing to reduce damages for an accountant's negligence in not discovering an embezzlement of plaintiff by the amount of the tax benefits plaintiff received by virtue of the theft). Respondents offer no reason to think that in enacting § 12(2) Congress intended to curtail the investor's recovery by relaxing the limit on off-sets imposed by the "direct product" rule.

Respondents' view of the purposes served by § 12(2)'s re-scission remedy is likewise flawed. Certainly a restoration of the plaintiff to his position prior to the fraud is *one* goal that will generally be served by § 12(2), as by common law rescission or restitution. But the 1933 Act is intended to do more than ensure that defrauded investors will be com-pensated: the Act also "aim[s] . . . to prevent further ex-ploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation [and] to place adequate and true information before the investor." S. Rep. No. 47, 73d Cong., 1st Sess., 1 (1933). See also *United States* v. *Naftalin*, 441 U. S. 768, 775–776 (1979). We may therefore infer that Congress chose a rescissory remedy when it enacted § 12(2) in order to deter prospectus fraud and encourage full disclosure as well as to make inves-tors whole. Indeed, by enabling the victims of prospectus fraud to demand rescission upon tender of the security, Con-gress shifted the risk of an intervening decline in the value of the security to defendants, whether or not that decline was actually caused by the fraud. See Thompson, The Measure of Recovery under Rule 10b–5: A Restitution Alternative to Tort Damages, 37 Vand. L. Rev. 349, 369 (1984) (hereinafter Thompson); Loss, at 1133. Thus, rescission adds an addi-tional measure of deterrence as compared to a purely com-pensatory measure of damages.

We also reject, as did the Court of Appeals, 768 F. 2d, at 958, respondents' alternative contention that tax benefits constitute "a return of, or a reduction in, 'consideration.'" Brief for Respondents 29–30. There is no indication that

Congress intended the word "consideration" in § 12(2) to mean anything other than what the context would suggest — the money or property given by the investor in exchange for the security. And, in view of the express offset for "income received," we think any implicit offset for a return of consideration must be confined to the clear case in which such money or property is returned to the investor. Here, the consideration given by petitioners in exchange for their partnership interests took the form of money, not tax deductions, and the fact that petitioners received tax deductions from which they were able to derive tax benefits therefore cannot constitute a return of that consideration. Accordingly, we hold that § 12(2) does not authorize an offset of tax benefits received by a defrauded investor against the investor's rescissory recovery, either as "income received" or as a return of "consideration," and that this is so whether or not the security in question is classified as a tax shelter.

## III

We now consider whether § 28(a) should alter our conclusion that § 12(2) does not authorize a reduction in the plaintiff's recovery in the amount of tax benefits received, and whether § 28(a) requires such an offset when a rescissory measure of damages is applied to a plaintiff's § 10(b) claim. Respondents suggest that § 12(2) and § 28(a) should be construed *in pari materia*, arguing that the Court of Appeals correctly determined that § 28(a) stands for a broad principle that recovery under the federal securities laws is strictly limited to the defrauded investor's "actual damages," and hence that anything of economic value received by the victim of fraud as a result of the investment must be used to reduce the victim's recovery. This principle, they say, requires us to construe § 12(2)'s express offset for "income received" on the security as encompassing any tax benefits received by petitioners.

The Court of Appeals relied on *Globus* v. *Law Research Service, Inc.*, 418 F. 2d 1276 (CA2 1969), cert. denied, 397 U. S. 913 (1970), which read § 17(a) of the 1933 Act *in pari materia* with § 28(a) insofar as the latter provision is deemed to bar *punitive* damages. See 768 F. 2d, at 954. Assuming, *arguendo*, that *Globus* was correctly decided, it is clearly distinguishable, for any private right of action under § 17(a) would be an implied one, and § 17(a) makes no reference to damages, whether punitive or compensatory. See 418 F. 2d, at 1283–1284. By contrast, Congress addressed the matter of prospectus fraud with considerable specificity in § 12(2), which not only antedates § 28(a), but was also left untouched by Congress when it passed the 1934 Act. See Loss, at 1024. We therefore decline to read § 28(a) as mandating a limit on the rescission remedy created by Congress in the 1933 Act by enactment of § 12(2). To hold otherwise would be to effect a partial repeal of § 12(2) by implication, and " '[i]t is, of course, a cardinal principle of statutory construction that repeals by implication are not favored.' " *Radzanower* v. *Touche Ross & Co.*, 426 U. S. 148, 154 (1976) (quoting *United States* v. *United Continental Tuna Corp.*, 425 U. S. 164, 168 (1976)). There is no "irreconcilable conflict" here between the two Acts, nor is this a case in which " 'the later act covers the whole situation of the earlier one and is clearly intended as a substitute.' " 426 U. S., at 154, quoting *Posadas* v. *National City Bank*, 296 U. S. 497, 503 (1936). Cf. *Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 384 (1983) (adopting a "cumulative construction of the remedies under the 1933 and 1934 Acts").

The issue whether and under what circumstances rescission or a rescissory measure of damages is available under § 10(b) is an unsettled one. In *Affiliated Ute Citizens* v. *United States*, 406 U. S. 128, 155 (1972), which involved violations of § 10(b) and Rule 10b–5 by a buyer of securities, this Court held that ordinarily "the correct measure of damages under § 28 of the Act, 15 U. S. C. § 78bb(a), is the differ-

ence between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct." Courts have also generally applied this "out-of-pocket" measure of damages in § 10(b) cases involving fraud by a seller of securities, see, *e. g., Harris* v. *American Investment Co.*, 523 F. 2d 220, 225 (CA8 1975), cert. denied, 423 U. S. 1054 (1976); Thompson, at 365. But there is authority for allowing the § 10(b) plaintiff, at least in some circumstances, to choose between "undoing the bargain (when events since the transaction have not made rescission impossible) or holding the defendant to the bargain by requiring him to pay [out-of-pocket] damages." Loss, at 1133. See, *e. g., Blackie* v. *Barrack*, 524 F. 2d 891, 909 (CA9 1975) ("While out of pocket loss is the ordinary standard in a 10b–5 suit, it is within the discretion of the district judge in appropriate circumstances to apply a rescissory measure"), cert. denied, 429 U. S. 816 (1976).

Respondents do not dispute that rescission or a rescissory measure of damages may sometimes be appropriate under § 10(b), nor do they dispute that in this case a rescissory recovery is appropriate on petitioners' § 10(b) claims as well as on their § 12(2) claims. Instead, they contend that § 28(a) strictly limits any such rescissory recovery to the plaintiff's net economic harm. We shall therefore assume, *arguendo*, that a rescissory recovery may sometimes be proper on a § 10(b) claim, and that this is such a case.

In enacting § 28(a), Congress did not specify what was meant by "actual damages." It is appropriate, therefore, to look to "the state of the law at the time the legislation was enacted" for guidance in defining the scope of this limitation. *Merrill Lynch, Pierce, Fenner & Smith* v. *Curran*, 456 U. S. 353, 378 (1982). When § 28(a) was enacted § 12(2) stood as a conspicuous example of a rescissory remedy, and we have found that Congress did not intend that a recovery in rescission under § 12(2) be reduced by tax benefits received. Accordingly, we think § 28(a) should not be read to compel a

different result where rescissory damages are obtained under § 10(b).

Even apart from the analogy furnished by § 12(2), this Court has never interpreted § 28(a) as imposing a rigid requirement that every recovery on an express or implied right of action under the 1934 Act must be limited to the net economic harm suffered by the plaintiff. To be sure, this Court has noted that "Section 28(a) of the 1934 Act . . . limits recovery in any private damages action brought under the 1934 Act to 'actual damages,'" *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 734 (1975), and *Affiliated Ute Citizens* clearly interpreted § 28(a) as governing the measures of damages that are permissible under § 10(b). 406 U. S., at 155. But the Court in *Affiliated Ute Citizens* also indicated that "where the defendant received more than the seller's actual loss . . . damages are the amount of the defendant's profit." *Ibid.* This alternative standard aims at preventing the unjust enrichment of a fraudulent buyer, and it clearly does more than simply make the plaintiff whole for the economic loss proximately caused by the buyer's fraud. Indeed, the accepted rationale underlying this alternative is simply that "[i]t is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them." *Janigan* v. *Taylor*, 344 F. 2d 781, 786 (CA1), cert. denied, 382 U. S. 879 (1965). See also *Falk* v. *Hoffman*, 233 N. Y. 199, 135 N. E. 243 (1922) (Cardozo, J.). Thus, the mere fact that the receipt of tax benefits, plus a full recovery under a rescissory measure of damages, may place a § 10(b) plaintiff in a better position than he would have been in absent the fraud, does not establish that the flexible limits of § 28(a) have been exceeded.

In any case, respondents' contention that plaintiffs will receive undeserved "windfalls" absent an offset for tax benefits is greatly overstated. Even if tax benefits could properly be characterized as a windfall—which we doubt—the tax laws will serve to reduce, although not necessarily to eliminate,

the extent of plaintiffs' net economic gain as compared to the *status quo ante*. We are told that the "tax benefit rule" will apply in cases of rescission, thus making the recovery taxable as ordinary income. See *Hillsboro National Bank* v. *Commissioner*, 460 U. S. 370 (1983); Brief for United States and SEC as *Amici Curiae* 25. Any residual gains to plaintiffs thus emerge more as a function of the operation of the Internal Revenue Code's complex provisions than of an unduly generous damages standard for defrauded investors.

Respondents also overlook the fact that Congress' aim in enacting the 1934 Act was not confined solely to compensating defrauded investors. Congress intended to deter fraud and manipulative practices in the securities markets, and to ensure full disclosure of information material to investment decisions. *Affiliated Ute Citizens, supra*, at 151; see also *Herman & MacLean*, 459 U. S., at 386–387. This deterrent purpose is ill served by a too rigid insistence on limiting plaintiffs to recovery of their "net economic loss." *Salcer*, 744 F. 2d, at 940. The effect of allowing a tax benefit offset would often be substantially to insulate those who commit securities frauds from any appreciable liability to defrauded investors. The resulting diminution in the incentives for tax shelter promoters to comply with the federal securities laws would seriously impair the deterrent value of private rights of action, which, we have emphasized, "provide 'a most effective weapon in the enforcement' of the securities laws and are a 'necessary supplement to Commission action.'" *Bateman Eichler, Hill Richards, Inc.* v. *Berner*, 472 U. S. 299, 310 (1985) (quoting *J. I. Case Co.* v. *Borak*, 377 U. S. 426, 432 (1964)).

The Court of Appeals' elaborate method for calculating damages and interest so as to offset tax benefits supplies an additional reason for rejecting its tax benefit offset rule. We need not inquire whether evidence concerning tax benefits is ordinarily so speculative as to be beyond the jury's province. Cf. *Norfolk & Western R. Co.* v. *Liepelt*, 444 U. S. 490

(1980). It is enough that there are formidable difficulties in predicting the ultimate treatment of the investor's claimed tax benefits, whether or not an audit has commenced, and that the burdens associated with reconstruction of the investor's tax history for purposes of calculating interest are substantial. We think that § 28(a) cannot fairly be read to require such a full-scale inquiry into a defrauded investor's dealings with the tax collector lest the investor escape with anything more than his "net economic loss."

Respondents' sole remaining contention is that a rule requiring the offset of tax benefits is required in view of "the economic reality of tax benefits produced by tax shelters." Brief for Respondents 14. They maintain that since "tax benefits to the partner represent an important tangible economic advantage expected to be derived from his investment," *Salcer, supra,* at 940, Congress must have intended that tax benefits would reduce the plaintiff's allowable recovery under § 28(a). In support of their version of "economic reality," respondents note that the return from a tax shelter investment may be analyzed as consisting of cash flow, tax benefits, and equity value, Brief for Respondents 11, and that some courts have held that investors may sue for fraud where a tax shelter investment has not produced promised tax benefits. See *Sharp* v. *Coopers & Lybrand,* 649 F. 2d 175 (CA3 1981), cert. denied, 455 U. S. 938 (1982).

We have already established that Congress did not design § 12(2) to accommodate these arguments, and that § 28(a) does not place them on a surer footing. Respondents essentially ask us to treat tax benefits as a separate asset that is acquired when a limited partner purchases a share in a tax shelter partnership. But the legal form of the transaction does not reflect this treatment. Petitioners purchased securities, thereby acquiring freely alienable rights to any income that accrued to them by virtue of their ownership. They did not, however, also acquire a separate, freely transferable bundle of tax losses that would have value apart from

petitioners' status as partners. For obvious reasons, tax deductions and tax credits are not, in the absence of a statutory provision to the contrary, freely transferable from one person to another if wholly severed from the property or activity to which they relate: "[t]he statutes pertaining to the determination of taxable income . . . disclos[e] a general purpose to confine allowable losses to the taxpayer sustaining them, *i. e.*, to treat them as personal to him and not transferable to or usable by another." *New Colonial Ice Co.* v. *Helvering,* 292 U. S. 435, 440 (1934). Accordingly, we decline to treat these tax losses as so much property created by the promoters of the partnership. It is for Congress, not this Court, to decide whether the federal securities laws should be modified to comport with respondents' version of economic reality.

We acknowledge that, absent an offset for tax benefits, plaintiffs may have an incentive to wait to raise their § 12(2) claims until they have received the bulk of the tax benefits available from a tax shelter, since after their securities are tendered they will cease to receive tax benefits. We are not persuaded, however, that courts lack adequate means to deal with any potential for abuse on this score. In cases under § 10(b), some courts have barred plaintiffs from electing rescission, or a rescissory measure of damages, where they delayed tender or suit in order to increase their expected recovery should the market decline. See, *e. g., Baumel* v. *Rosen,* 412 F. 2d 571, 574–575 (CA4 1969), cert. denied, 396 U. S. 1037 (1970); Loss, at 1133, n. 127; Thompson, at 369–370. A similar rule may well be appropriate where plaintiffs delay tender or suit in order to obtain additional tax benefits, although we need not so decide today.

We also have no occasion in this case to decide whether, assuming that a rescissory recovery may sometimes be proper under § 10(b), plaintiffs in such cases should invariably be free to elect a rescissory measure of damages rather than out-of-pocket damages. Consequently, we do not consider whether courts may ever refuse to allow a rescissory recovery

under § 10(b) where the "premium" for expected tax benefits represented a large portion of the purchase price, in which event the out-of-pocket measure might yield a significantly smaller recovery. See *Salcer*, 774 F. 2d, at 940, and n. 5. In this case, a rescissory measure of damages was determined to be proper, and respondents have abandoned their initial challenge to that ruling.

We conclude, then, that the Court of Appeals erred in holding that § 28(a) requires a rescissory recovery under § 12(2) or § 10(b) to be reduced by tax benefits received from a tax shelter investment. The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, concurring.

I join the Court's well-reasoned opinion. As the Court recognizes, this case concerns the proper measure of damages under two distinct statutory schemes — § 12(2) of the Securities Act of 1933, 15 U. S. C. § 77*l*(2), and §§ 10(b) and 28(a) of the Securities Exchange Act of 1934, 15 U. S. C. §§ 78j(b) and 78bb(a). See *ante*, at 649. The Court correctly concludes that, under the specific remedial formula set out in § 12(2), the tax benefits generated by an investment provide no basis for reducing a defrauded investor's recovery. *Ante*, at 655–660. Since petitioners prevailed on their § 12(2) claim as well as on their § 10(b) claim, they are entitled to select the damages remedy more favorable to them. I write separately merely to explain why it may be proper to take tax benefits into account in a case brought solely under § 10(b) and Rule 10b–5 of the SEC, 17 CFR § 240.10b–5 (1985), a question the Court leaves open. *Ante*, at 666–667.

The measure of damages in a § 12(2) case brought by an investor who still owns the security involved is rescissory: the statute permits the defrauded investor "to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the

tender of such security . . . ." I agree with the Court that tax benefits cannot be considered either "income" or "consideration." *Ante*, at 656–657, 659–660. Recovery in a case brought under § 10(b) is governed by § 28(a) which, unlike § 12(2), does not set out a specific method of calculating damages. Rather, § 28(a) merely limits recovery to the "actual damages on account of the act complained of." A rescissory measure of damages may sometimes be appropriate. See *ante*, at 661–662. I agree with the Court that when rescission is the appropriate remedy tax benefits should not be taken into account. Normally, however, the proper measure of damages in a § 10(b) case is an investor's out-of-pocket loss, that is, "the difference between the fair value of all that [the plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct." *Affiliated Ute Citizens* v. *United States*, 406 U. S. 128, 155 (1972); see *ante*, at 661–662.

To ascertain out-of-pocket loss requires taking into account all the elements that go into the price of a tax shelter. That price will reflect both the value of the underlying asset — here, a motel with a potential income stream and a potential for capital appreciation — and the value of the tax write-offs that the construction and operation of the underlying asset will generate. See *Salcer* v. *Envicon Equities Corp.*, 744 F. 2d 935, 938, 940 (CA2 1984), vacated and remanded, *post*, p. 1015. See also *Austin* v. *Loftsgaarden*, 675 F. 2d 168, 174 (CA8 1982) *(Austin I)* (respondent forced to increase potential tax benefits to attract investors). An investor will pay more for a share of an underlying asset when ownership will provide not only income and capital appreciation but also tax benefits.[1]

---

[1] For example, investor A, who invests in a security that is not a tax shelter, might pay $100 for a share in a corporation that runs hotels in the expectation that he will receive $10 in dividends each year plus $5 in appreciation of the value of the stock. Investor B might pay $110 for a proportionate share in a partnership that runs hotels in the expectation that, in

An investor who has invested in a tax shelter can be defrauded in either or both of two ways. First, the promoter may have misled him with respect to the level of potential tax benefits. See, *e. g.*, *Lasker* v. *Bear, Stearns & Co.*, 757 F. 2d 15 (CA2 1985); *Sharp* v. *Coopers & Lybrand*, 649 F. 2d 175 (CA3 1981), cert. denied, 455 U. S. 938 (1982). Second, the promoter may have misled him with respect to the value of the underlying asset. See, *e. g.*, *Salcer*, 744 F. 2d, at 940, n. 5 (referring to views of the SEC as *amicus curiae*). This case falls only within the latter category: petitioners do not claim they were misled with regard to the tax benefits they could expect from their investment; rather, they claim respondents misled them with respect to the profitability of the motel.

An investor who receives the promised tax benefits, but not the promised income stream or appreciation, of course has been injured. But this injury—the difference between the value of what he received and the value of what he was promised—is represented, not by the entire purchase price, but rather by that portion of the purchase price which went toward a high quality underlying asset when what was received was a lower quality asset. In other words, the investor received the benefit of his bargain with respect to that part of the purchase price which went toward buying the tax benefits. The proper measure of recovery in such a case is therefore the part of the purchase price attributable to payment for an asset that was never received.[2] See also *Salcer*,

addition to receiving the same amount of income from the hotels and the same possible appreciation in the value of the partnership share as A receives, he will also receive $25 in deductions he can use to offset income from another source. The additional $10 investor B pays to obtain the tax benefits is a "premium" attributable to receipt of tax benefits rather than receipt of economic benefits from the underlying asset.

[2] Suppose that both investor A and investor B, see n. 1, *supra*, are victims of material misrepresentations and that, in both cases, the hotels actually are worthless. If investor A (the non-tax shelter investor) sued under § 10(b), he would be entitled to damages of $100. If investor B actually

744 F. 2d, at 940, n. 5. The Court recognizes that it may be proper to reduce recovery in cases brought solely under § 10(b) and involving securities as to which tax consequences provided a major inducement to investment, and I therefore join its opinion.

JUSTICE BRENNAN, dissenting.

Section 12(2) of the Securities Act of 1933 provides that an investor may sue a seller of securities for misrepresentation of material facts in the prospectus or offering memorandum "to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." 15 U. S. C. § 77*l*(2). I agree with the Court that § 12(2) prescribes the remedy of rescission and restitution for investors who still own the securities. Unlike the Court, however, I believe that § 12(2) requires that restitution to the plaintiff be reduced by any tax benefits that a purchaser has bargained for and received from a tax shelter investment.

had received the anticipated tax benefits (*e. g.*, because, although the roof leaked and the rooms were unusable, the construction costs were actually incurred), he too would have actual damages of $100 (because that part of the purchase price of the security that represented payment for the asset that was claimed to be worth $100 was in fact worthless) and not $110 (because he did receive the tax benefits he was promised, for which a fully informed investor would have paid $10 at the time B bought the investment). Similarly, if it turned out that the ownership shares in the hotel are worth only $40, rather than $100 (*e. g.*, because occupancy is lower than had been projected and revenues are therefore less than anticipated), both investor A and investor B will have actual damages of $60.

This is *not*, however, to say, as the Court of Appeals did, see *Austin* v. *Loftsgaarden*, 768 F. 2d 949, 952 (CA8 1985) *(Austin II)*, that a plaintiff's recovery should be reduced by the amount of the tax benefits received. No rational investor would pay $1 for the ability to shelter $1 of income. Instead, recovery should be reduced by the market value of the economic benefits the plaintiff was promised and actually obtained, which includes the ability to shelter a particular amount of income. The value of that right can be established by expert testimony.

I too begin with the language of the statute. We know that Congress intended to establish rescission and restitution as the remedy for prospectus misrepresentation, not because it said so directly, but because that is the relief Congress describes in § 12(2). Given this intent, I would look for guidance in interpreting the word "income" in the theory and goals of common-law and equitable restitution, rather than in the Internal Revenue Code, as the Court does. L. Loss, Fundamentals of Securities Regulation 1022 (1983) ("Section 12(2) can perhaps best be analyzed and evaluated by comparing it with common law (or equitable) rescission, from which it was adapted").

At common law and equity, rescission entails the undoing of the original transaction and restitution involves the restoration of each party to his precontract position. *E. g.*, 3 H. Black, Rescission of Contracts and Cancellation of Written Instruments § 616, p. 1482 (2d ed., 1929); D. Dobbs, Remedies § 9.4, p. 618 (1973); C. McCormick, Law of Damages § 121, p. 448 (1935). In order to reestablish the *status quo ante*, the plaintiff must return to the defendant the subject of the transaction, plus whatever else he may have bargained for and received under the contract by way of money, property, other consideration, or benefit, and the defendant must return to the plaintiff the consideration furnished by the plaintiff, plus the value of any other direct benefit the defendant received from the bargain, such as interest. *E. g.*, 2 Black, *supra*, § 617, at 1485, 1487; 5 A. Corbin, Contracts § 1114, p. 607 (1964); 1 G. Palmer, Law of Restitution § 3.9, p. 275, § 3.11, p. 294, § 3.12, pp. 303–305 (1978); Thompson, The Measure of Recovery under Rule 10b–5: A Restitution Alternative to Tort Damages, 37 Vand. L. Rev. 349, 366, 369 (1984). In practice, where the defendant has sold something to the plaintiff for money, the steps leading to return to the status quo are streamlined: generally the plaintiff must tender the subject of the sale to the defendant and the defendant must tender to the plaintiff the sale price plus inter-

est, minus whatever direct value the plaintiff has received from the transaction. If the plaintiff were not required to restore the value he has received from the bargain to the defendant, and were allowed to recover the full consideration he gave for the transaction, the plaintiff would be placed in a better position than he occupied before the contract was made—a result contrary to the theory of restitution. *E. g.* Corbin, *supra;* 3 Black, *supra,* § 617, at 1488 ("[A] party will not be permitted to rescind a contract so as to reclaim what he has parted with, and at the same time retain what he has received in the transaction").

Application of these common-law principles to the rescission of a misrepresentation-induced sale of interests in a real estate limited partnership marketed as a tax shelter requires that the investor-plaintiff's award be offset by tax benefits that the plaintiff bargained for and received as a result of the investment. This is so because a major portion of what the investor bargains for and purchases in a tax shelter is the tax benefit. See *Salcer* v. *Envicon Equities Corp.*, 744 F. 2d 935, 940 (CA2 1984) ("One of the prime motivations for investment in limited real estate partnerships is the unique tax advantage made available to high tax bracket individuals"), vacated and remanded, *post,* p. 1015. Banoff, To What Extent Will Benefits from Tax Shelters Be Permitted to Offset Rescission Damages?, 57 J. Taxation 154, 157 (1982) ("[T]he plaintiff invests in a tax shelter largely for tax savings motives"); Note, *Austin v. Loftsgaarden:* Securities Fraud in Real Estate Limited Partnership Investments—Offsetting Plaintiffs' Relief to the Extent of Tax Benefits Received, 16 Creighton L. Rev. 1140, 1143 (1983). Indeed, the facts that an investment is marketed as a tax shelter and that the investor generally pays a higher price for a tax sheltering investment than he would for one simply producing future growth or income, *Salcer, supra,* at 940, indicates that the tax shelter aspect of the investment is a

bargained-for part of the agreement, rather than an incidental benefit. It would be ignoring reality to maintain that the economic benefit that flows to an investor from a tax shelter investment is not as direct a benefit of his bargain as are dividends that flow from a securities investment. Cf. *United Housing Foundation, Inc.* v. *Forman,* 421 U. S. 837, 863–864 (1975) (BRENNAN, J., dissenting) (footnote omitted) ("[I]n a practical world there is no difference between [money earned and money saved through tax advantages]. The investor finds no reason to distinguish . . . between tax savings and after-tax income"). To a rational investor, a security that yields $101 of tax benefits differs from a security that yields $100 in dividends in only one way—by $1.

In my view, Congress' use of the word "income" in § 12(2) does not require us to ignore this reality. The term "income" may fairly be construed to embrace the tax benefits that respondents purchased. Income is commonly defined as "a gain or recurrent benefit usually measured in money that derives from capital or labor." Webster's Ninth New Collegiate Dictionary 610 (1983). Under that ordinary meaning, a bargained-for tax benefit is income: it is a gain or benefit measured in money that the investor purchases, that is, that he derives from capital. Petitioners bargained for and received a monetary benefit, in the form of tax savings, from their investments in respondents' tax shelter. The fact that this monetary benefit was realized through tax savings rather than in the form of a check delivered from the partnership to petitioners has no bearing on whether petitioners have received a direct monetary benefit from their investments. There is nothing in the language or history of the Securities Act of 1933 suggesting that Congress, in using the word "income," intended to reject this common meaning of the word. I think that a fair reading of Congress' intent was simply to provide for rescission and restitution, and not to carve out, to the exclusion of all other forms of value that flow directly

from a securities transaction, only income as defined by the tax code, for offset against the plaintiff's award.*

Assuming, as does the Court, that rescission and restitution constitute proper relief for a violation of § 10(b) of the Securities Exchange Act of 1934, I would for the same reasons conclude that tax benefits should be offset against petitioners' award under that provision.

I would affirm the judgment of the Court of Appeals and therefore respectfully dissent.

---

*I also disagree with the Court's assertion that because the tax benefits "accrue only if the tax deductions or credits the investment throws off are *combined* with income generated by the investor or taxes owed on such income," they "would in all likelihood not have been deemed a 'direct product' of the security at common law." *Ante*, at 658. The deductions or credits received in a transaction such as the one at issue in this case are valued in a manner that is entirely independent of anything that the investor may or may not do. In other words, in valuing a tax shelter for marketing purposes, the seller assumes that a buyer has need for the tax deductions the investment will generate, just as the seller of a rebuilt automobile engine assumes that the buyer has a car in which to put that engine. We do not — at least I would not — describe the value that an engine has when placed in a car as "indirect" simply because the buyer had to acquire a car in order to exploit that value.