819 So.2d 928 (2002)
John G. MORTELLITE, Appellant,
v.
AMERICAN TOWER, L.P., Appellee.
John G. Mortellite, Appellant,
v.
Owen P. Mills, Sonja L. Mills, and OPM-USA, Inc., Appellees.
Nos. 2D00-5387, 2D01-1102.
District Court of Appeal of Florida, Second District.
June 21, 2002.
*930 James E. Aker and Mark Dungan of Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A., Sarasota, for Appellant.
John P. Harllee, III, of Harllee & Bald, P.A., Bradenton, for Appellee American Tower, L.P.
Thomas H. Dart and William G. McCormick of Ruden, McClosky, Smith, Schuster & Russell, P.A., Sarasota, for Appellees Owen P. Mills and Sonja L. Mills.
No appearance for Appellee OPM-USA, Inc.
COVINGTON, Judge.
The appellant, John G. Mortellite, challenges final judgments entered in these consolidated cases involving fraud, breach of fiduciary duty, and purported securities violations. Mr. Mortellite raises seven issues on appeal. We, however, find merit only in three of his issues, which relate to the calculation of compensatory damages, the trial court's rejection of his expert witness, and the trial court's finding that he was not entitled to punitive damages on his claim for breach of fiduciary duty. We reverse.
In 1994, Mr. Mortellite befriended his neighbors, Owen P. Mills and his wife, Sonja L. Mills, two of the appellees herein. In December 1995, Mr. Mortellite and the Millses entered into a General Share Purchase Agreement with respect to the formation of a cellular tower company called OPM-USA, Inc., also an appellee herein. Pursuant to the agreement, the Millses were to receive ninety percent of OPM's stock in exchange for their $900,000 contribution to the company, and Mr. Mortellite was to receive ten percent of OPM's stock for his $100,000 contribution. The agreement further designated Mr. Mills as president of the company, Mr. Mortellite as vice president, and Mrs. Mills as secretary/treasurer. All three individuals were named as directors of OPM.
At its inception, OPM was a fairly modest venture that operated out of the Millses' garage. The goal of the company was to construct cellular communications towers and sell them to communications companies. Mr. Mills handled all company funds and was essentially in charge of acquiring capital for OPM. Mr. Mortellite, as a civil engineer with a background in construction and real estate, was responsible for acquiring land leases and obtaining permits for the construction of cellular towers.
Pursuant to the efforts of the Millses and Mr. Mortellite, OPM rapidly expanded. To accommodate the expansion, new office space was procured and additional employees were hired, including Mr. Mortellite's wife and son. Because of the nature of its business, OPM required massive amounts of capital to fund its growing operations. Thus, in November 1996, OPM borrowed $10 million on a line of credit from SunTrust Bank, guaranteed by both the Millses and Mr. Mortellite.
As OPM's prospects increased, the Millses sought additional financing, which was imperative to OPM's continued operation. Because SunTrust Bank could not meet OPM's extraordinary financing needs, subordinated debt was solicited through SunTrust Capital Markets, Inc. Mr. Mortellite was not involved in any of *931 the Millses' efforts to obtain additional financing.
Several companies responded to the debt solicitation efforts of SunTrust Capital Markets, Inc. In July 1997, a company known as American Tower, L.P., another appellee herein, became particularly interested in OPM. Thus, at that time, James Eisenstein, the principal of American Tower, began discussions with Mr. Mills about financing for OPM. On August 1, 1997, however, those discussions culminated in a serious offer to purchase OPMincluding one hundred percent of its stock.
Mr. Mortellite was on vacation at the time of Mr. Mills' initial discussions with Mr. Eisenstein and was never informed of them. In fact, when Mr. Mortellite returned from vacation on August 2, 1997, Mr. Mills immediately advised him to take another two-week vacation. Mr. Mills so advised Mr. Mortellite without a word about the American Tower purchase offer. When Mr. Mortellite returned from that vacation on August 16, 1997, Mr. Mills, again without a word about American Tower, told him to take another week of vacation.
By a letter dated August 19, 1997, American Tower offered to purchase OPM for $96 million. On August 21, 1997, Mr. Mills made a counteroffer of $105 million. At some point during that time, Mr. Mills informed Mr. Eisenstein that he had a ten percent shareholder to buy out. When Mr. Eisenstein asked Mr. Mills how he proposed to do that, Mr. Mills responded, "Don't worry. He has no idea what this is worth."
On August 23, 1997, when Mr. Mortellite returned from his final week of vacation, Mr. Mills informed him that things were not working out. He therefore terminated Mr. Mortellite from his OPM post. Mr. Mills indicated he would buy out Mr. Mortellite's ten percent interest in OPM in accord with the terms of the General Share Purchase Agreement. At that time, Mr. Mortellite was still completely unaware of American Tower's offer to purchase OPM.
At an OPM board meeting on Friday, August 29, 1997, Mr. Mills still did not disclose American Tower's offer to purchase one hundred percent of OPM's stock. This was so, despite a direct inquiry from Mr. Mortellite's attorney as to whether there were any pending transactions contemplated by OPM. During the meeting, there was some discussion about whether Mr. Mills would buy out Mr. Mortellite's ten percent interest for $1.5 million or whether Mr. Mortellite would attempt to buy out the Millses' interest for $13.5 million. By the conclusion of the meeting, however, it was agreed that Mr. Mortellite would officially resign from OPM and that the Millses would proceed to buy out Mr. Mortellite's ten percent interest in the company at a value to be determined in accord with the terms of the General Share Purchase Agreement.
The foregoing notwithstanding, on Sunday, August 31, 1997, the Millses went to the Mortellite home and offered Mr. Mortellite a check for $1.5 million for his ten percent interest in OPM. At that time, Mr. Mills still did not disclose any information about the American Tower offer. Nor was the value of OPM's stock ever determined. Nonetheless, Mr. Mortellite accepted the Millses' check. Contemporaneously with that acceptance, Mr. Mortellite signed a mutual release and stock redemption agreement. The Millses thus became the owners of one hundred percent of all out-standing shares of OPM stock.
The following week, the paperwork on the American Tower purchase offer was completed. The deal ultimately closed in January 1998, with American Tower becoming the owner of one hundred percent of all outstanding shares of OPM stock.
*932 Mr. Mortellite ultimately brought suit for damages against the Millses and OPM in November 1998. On March 31, 1999, he filed a second amended complaint alleging various causes of action against the Millses, OPM, and American Tower.
On November 22, 2000, the trial court entered a final judgment in favor of American Tower. The trial court concluded that Mr. Mortellite had failed to demonstrate any right to relief against American Tower as to his claims for an accounting and a constructive trustthe only causes of action asserted against American Tower.
Thereafter, on January 31, 2001, the trial court entered a final judgment on Mr. Mortellite's claims against the Millses and OPM for securities fraud under chapter 517, Florida Statutes (1997); fraudulent inducement; and breach of fiduciary duty. The trial court determined that Mr. Mortellite's chapter 517 securities fraud claim could not stand because his interest in OPM did not constitute a security as that term is defined by chapter 517 and prevailing case law. The trial court also determined that there was no evidence or legal basis for any of Mr. Mortellite's claims against Mrs. Mills or OPM. The trial court did find, however, that:
Mills, as the majority shareholder of OPM, did owe a fiduciary duty to Mortellite, the minority shareholder, which required Mills to act in good faith. Mills breached this duty and acted in bad faith toward Mortellite when he received the offer from American Tower and intentionally did not disclose the offer to Mortellite.
In sending Mortellite off for additional vacations, Mills intended to keep Mortellite out of the office and away from any information about pending negotiations. By sending Mortellite off and by not disclosing anything about the American Tower offer, Mills deceived Mortellite into thinking that there were no pending negotiations to purchase the OPM stock and with the further intention that Mortellite would act to his detriment. Mills knew or should have known that Mortellite would act upon the non-disclosure, and he did, foregoing the provisions of the [General Share Purchase] Agreement to value the stock, accepting Mills' offer of $1.5 million, and entering into the [r]elease and the [stock redemption agreement]. Mortellite was, therefore, fraudulently induced to sign the [r]elease and the [stock redemption agreement].
(Citations omitted.)
For purposes of calculating compensatory damages, the trial court determined that the date of valuation of the OPM stock should be determined in accord with the General Share Purchase Agreement. The valuation date was thus set at July 31, 1997. The trial court then valued the OPM stock at $15 million, based on evidence that "[i]n his offer to purchase Mills' stock at the board meeting of August 29, 1997, Mr. Mortellite's stated opinion of the value of OPM was $15 million." Applying the out-of-pocket damages rule to Mr. Mortellite's fraudulent inducement and breach of fiduciary duty claims, the trial court concluded that Mr. Mortellite was not entitled to compensatory damages because he had received $1.5 millioni.e., ten percent of $15 millionfor his ten percent interest in OPM. It was thus the trial court's ultimate conclusion that "[t]here being no compensatory damages, the claim for punitive damages [with respect to Mr. Mortellite's breach of fiduciary duty claim] fails."
Mr. Mortellite timely appealed the November 2000 judgment for American Tower and the January 2001 judgment on his claims against the Millses and OPM. Those appeals have been consolidated for purposes of the instant review.
*933 As to the judgment for American Tower, we find no merit in Mr. Mortellite's challenge thereto. Mr. Mortellite contends the trial court erred in entering judgment upon an involuntary dismissal of his claims against American Tower. The record, however, supports the trial court's determination that Mr. Mortellite failed to establish any legal basis for the causes of action he asserted against American Tower. We therefore affirm that judgment without discussion.
As to the January 2001 judgment on his claims against the Millses and OPM, Mr. Mortellite contends, among other things, that the trial court erred in finding that he failed to assert a viable chapter 517 securities fraud claim. In analyzing that claim, however, the trial court correctly concluded that Mr. Mortellite's interest in OPM, pursuant to the General Share Purchase Agreement, did not constitute a security. Specifically, the final judgment provides:
Under Chapter 517, Florida Statutes, a security is an investment of money, in a common enterprise, with an expectation of profit, to be derived solely from the efforts of others. Stottler Stagg and Associates, Inc. v. Argo, 403 So.2d 617 (Fla. 5th DCA 1981)[;] Rudd v. State, 386 So.2d 1216 (Fla. 5th DCA 1980). The Agreement in this action meets the first three tests, but not the fourth. The profit to be derived under the Agreement was to come from the efforts of both Mills and Mortellite and not solely from the efforts of persons other than Mortellite. The security fraud claim [therefore] fails.
We agree with the trial court's analysis and therefore conclude that Mr. Mortellite's assignment of error in the foregoing regard is without merit. We do, however, find merit in Mr. Mortellite's assignments of error as to the trial court's assessment and ultimate determination on the issue of damages.
Mr. Mortellite contends the trial court erred in failing to award him compensatory and/or punitive damages. In that regard, he contends: (1) the trial court applied an incorrect measure of damages in assessing his entitlement to compensatory damages, which resulted in a grossly inadequate award; (2) the trial court erroneously discounted the testimony of his expert business appraiser and otherwise improperly rejected his conclusions in the absence of lay testimony to the contrary; and (3) the trial court erred in failing to award punitive damages irrespective of whether he was entitled to compensatory damages.
In this instance, the trial court, pursuant to Nordyne, Inc. v. Florida Mobile Home Supply, Inc., 625 So.2d 1283 (Fla. 1st DCA 1993), applied the out-of-pocket rule in determining whether Mr. Mortellite was entitled to compensatory damages. Under the out-of-pocket rule, damages resulting from fraud are determined by the difference between the purchase price and the actual value of the property at issue. Id.: see also Martin v. Brown, 566 So.2d 890 (Fla. 4th DCA 1990). Mr. Mortellite contends that the out-of-pocket rule should not have been applied here. Rather, he argues that the trial court should have employed the disgorgement of profits theory set forth in Janigan v. Taylor, 344 F.2d 781 (1st Cir.1965). Had that theory been applied, Mr. Mills would have been compelled to disgorge any profits attributable to his fraudulent conduct and to pay them to Mr. Mortellite as compensatory damages. Because the record shows that Mr. Mortellite ultimately chose or otherwise agreed to the out-of-pocket rule as the appropriate measure of compensatory damages, we conclude that any error in assessing damages here did *934 not arise from the application of the incorrect rule or measure of damages but from the trial court's ultimate valuation of OPM.
The final judgment expressly states that, at the time Mr. Mills tendered and Mr. Mortellite accepted the $1.5 million payoff, the value of OPM, contrary to the terms of the General Share Purchase Agreement, had not been determined. The trial court in fact expressly found that the General Share Purchase Agreement, which was supposed to govern the entire transaction, had been completely ignored.
Thus, in valuing OPM for purposes of determining damages, the trial court, in light of Mr. Mills' fraud and breach of fiduciary duty, looked to the General Share Purchase Agreement to establish the proper valuation date. That date was properly determined to be July 31, 1997. The trial court then, in setting the value of OPM as of that date, completely rejected and otherwise failed to reconcile the testimony of two expert tower business appraisers. It also ignored other compelling, albeit conflicting, evidence of OPM's value and determined that, as of July 31, 1997, OPM was worth $15 million. That determination was based exclusively on Mr. Mortellite's untested and presumably uninformed opinion of OPM's value as expressed at a board meeting on August 29, 1997a time when Mr. Mortellite was unquestionably acting to his detriment pursuant to Mr. Mills' fraudulent deception.
Based on the fact that, by August 1, 1997one day after the valuation dateAmerican Tower offered to purchase OPM for considerably more than $15 million, and based on the fact that Mr. Mills told James Eisenstein of American Tower that Mr. Mortellite had no idea what OPM was worth, the trial court's valuation of OPM was erroneous because it was not based on competent evidence. We therefore conclude that further proceedings are necessary to determine Mr. Mortellite's entitlement to compensatory damages, based on a proper valuation of OPM.
We write further to express our concern regarding the trial court's rejection of testimony from Mr. Mortellite's expert on the issue of damages. The trial court stated in its final judgment that the theory of damages expressed by Mr. Mortellite's expert was "too speculative, especially in light of [the expert's] lack of specific experience in the area of valuation of communications tower businesses, experience which [the Millses' expert] has had." Because we are remanding this cause for further proceedings on the issue of damages, we offer no opinion as to whether the theory of damages offered by Mr. Mortellite's expert was too speculative. The trial court, however, primarily rejected the opinion of Mr. Mortellite's expert because of his lack of experience. We conclude that the record does not support the trial court's finding in that regard. The record in fact suggests that there was a misconception regarding the qualifications of Mr. Mortellite's expert. It further appears that the vast experience and qualifications of Mr. Mortellite's expert were inadvertently attributed to the Millses' expert. Thus, this issue, too, should be revisited on remand.
Finally, Mr. Mortellite contends he was entitled to punitive damages for Mr. Mills' breach of fiduciary duty, irrespective of a compensatory damage award. We agree. In Ault v. Lohr, 538 So.2d 454 (Fla.1989), the Florida Supreme Court held that "an express finding of a breach of duty should be the critical factor in an award of punitive damages. Accordingly, we hold that a finding of liability alone will support an award of punitive damages `even in the absence of financial loss for which compensatory damages would be appropriate.'" Id. at 456 (quoting Lassiter *935 v. Int'l Union of Operating Eng'rs, 349 So.2d 622, 626 (Fla.1976)).
In the instant case, the final judgment shows that the trial court expressly determined that Mr. Mills breached his fiduciary duty to Mr. Mortellite and acted in bad faith toward him when he failed to disclose American Tower's offer to purchase OPM. Based on that finding, we conclude Mr. Mortellite will ultimately be entitled to a punitive damage award even if, after remand, it is again determined that he is not entitled to compensatory damages.
Therefore, based on the foregoing, the final judgment for American Tower in appeal number 2D00-5387 is affirmed. The final judgment on Mr. Mortellite's claims against the Millses and OPM in appeal number 2D01-1102 is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
Affirmed in part, reversed in part, and remanded.
STRINGER, J., Concurs.
CASANUEVA, J., Concurs with opinion.
CASANUEVA, Judge, Concurring.
I concur with the majority's opinion. Because I agree with the proposition that it "is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them," Janigan v. Taylor, 344 F.2d 781, 786 (1st Cir.1965), I submit that in similar cases the trial court should apply a disgorgement theory of damages.
Eighty years ago in a case also involving misrepresentations between a company's stockholders, Justice Cardozo wrote:
Suing in equity, he may reach the proceeds of the resale, securities and cash, though the price upon resale is found to be greater than the value. That would be true though the resale were unrelated to the fraud. Even more plainly it is true where, as here, the resale itself is the very reason for the fraud. Equity will not be overnice in balancing the efficacy of one remedy against the efficacy of another when action will baffle, and inaction may confirm, the purpose of the wrongdoer.
Falk v. Hoffman, 233 N.Y. 199, 135 N.E. 243, 244 (1922) (citation omitted).
Here, Mr. Mortellite sold his ten percent share of the company for a mere $1.5 million, based on Mr. Mills' fraudulent misrepresentations about the true value of the company. Mr. Mortellite's theory of the case is that by misrepresenting the true value of the company, a value based on American Tower's pending offer to purchase the company for $105 million, Mr. Mills managed to keep an additional $9 million of profit out of Mr. Mortellite's pocket. If Mr. Mortelitte's theory of the case is believed by the trial court, then "there can be no speculation but that the defendant actually made the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud, whether foreseeable or not." Janigan, 344 F.2d at 786. Janigan's remedy was the disgorgement of profits, a remedy cited with approval by the Supreme Court in Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 155, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); see also Randall v. Loftsgaarden, 478 U.S. 647, 663-64, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986).
Admittedly, Janigan, Affiliated Ute Citizens, and Randall discuss damages in a securities context governed by statute. The purpose of prohibiting the unjust enrichment of the person perpetrating a fraud transcends statutory actions particularly where the goal in tort actions "is to restore the injured party to the position it would have been in had the wrong not been committed." Nordyne, Inc. v. Fla. Mobile Home Supply, Inc., 625 So.2d 1283, *936 1286 (Fla. 1st DCA 1993). The application of the disgorgement theory would serve at least two important public policies. First, the victim would be fully compensated; second, the threat of losing all profits should deter others from acts of fraudulent concealment.
We are remanding this case so that the trial court may recalculate damages under the out-of-pocket rule that compares the purchase price to the actual value of the company. Nystrom v. Cabada, 652 So.2d 1266, 1268 (Fla. 2d DCA 1995). It is arguable that the actual value of this stock is its fair market value, $105 million, which is what a willing buyer would pay to a willing seller, neither party being obligated to act.