NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

JOE SAMUEL BAILEY, individually, and          )
on behalf of LASERSCOPIC SPINAL               )
CENTERS OF AMERICA, INC.;                     )
LASERSCOPIC MEDICAL CLINIC LLC;               )
LASERSCOPIC DIAGNOSTIC IMAGING                )
AND PHYSICAL THERAPY, LLC;                     )
LASERSCOPIC SPINAL CENTER OF                   )          Case No. 2D13-612
FLORIDA, LLC; and LASERSCOPIC                  )
SPINE CENTERS OF AMERICA, INC.,               )
                                              )
     Appellants/Cross-Appellees,   )
                                              )
v.                                            )
                                              )
JAMES S. ST. LOUIS, D.O.; MICHAEL W.          )
PERRY, M.D.; EFO HOLDINGS L.P.;               )
EFO LASER SPINE INSTITUTE, LTD.;              )
LASER SPINE INSTITUTE, LLC; LASER            )
SPINE MEDICAL CLINIC, LLC; LASER             )
SPINE PHYSICAL THERAPY, LLC;                   )
LASER SPINE SURGICAL CENTER, LLC;            )
and EFO GENPAR, LP,                           )
                                              )
     Appellees/Cross-Appellants.   )
_____)

Opinion filed February 3, 2016.

Appeal from the Circuit Court for
Hillsborough County; Richard A. Nielsen,
Judge.

Stephen N. Zack, Jennifer G. Altman, and
Shani Rivaux of Boies, Schiller & Flexner,
LLP, Miami; and Stuart C. Markman and
Kristin A. Norse, and Robert R. Ritsch, of
counsel, of Kynes, Markman & Felman,

P.A., Tampa, for Appellants/Cross-
Appellees.

Stacy D. Blank, Joseph H. Varner, III, and
Bradford D. Kimbro of Holland & Knight LLP,
Tampa, for Appellees/Cross-Appellants.


CASANUEVA, Judge.

The Appellants seek review of a final judgment entered after a bench trial on their claims against the various Appellees for breach of fiduciary duty, defamation, slander per se, violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), conspiracy, and tortious interference as to several individuals and entities. In this appeal, the Appellants challenge the amount of damages they were awarded for their breach of fiduciary duty claim, and they challenge the trial court's failure to award any damages for their FDUTPA claim. They also argue that the trial court erred in finding that some of their claims were barred by the statute of limitations. We reverse the award of damages because we cannot determine what evidence the trial court relied upon to determine the amount, and the amount of damages awarded appears to be a small percentage of the damages presented at trial. We also reverse the trial court's finding that the facts did not support an award of punitive damages and the trial court's finding that Appellants were not entitled to damages for their FDUTPA claim. We do not find merit in the other arguments raised on appeal and affirm those points without discussion.

The Appellees filed a cross-appeal arguing that the trial court erred in awarding damages for conspiracy, that a release signed in a previous lawsuit precluded two of the Appellants' claims, that the trial court erred in finding the Appellees liable for

tortious interference with terminated employees, and that the trial court erred in awarding damages for the slander claim. We do not find merit in any of the Appellees' arguments in their cross-appeal and do not discuss them further.

DAMAGES

Out-of-Pocket Damages

During trial, the Appellants called two expert witnesses to opine as to the amount of damages they suffered. In its order, the trial court accepted the calculations of only one of the experts "as to out of pocket losses," and it found that the expert testified that the Appellants suffered out-of-pocket damages of $6,831,172.[1]

Yet, the final judgment awards the Appellants less than one-fourth of this amount, $1,600,000, and the trial court provides no explanation for its reduced award. In order to perform appellate review, the trial court's rationale must be made available. Accordingly, we reverse and remand for further proceedings for the trial court to explain how it arrived at this amount. If the passage of time has made this impossible, the trial court should so find and conduct a second trial on the issue of damages.

Disgorgement Damages

The Appellants argue that the trial court erred in denying their request for disgorgement damages for the claims of breach of fiduciary duty and tortious interference. The Appellees claim that the trial court's award of $1,600,000 to the Appellants included disgorgement damages. The Appellees state in their brief that the

---

[1]The order on appeal consists of over 130 pages. In an effort to keep this opinion as succinct as possible, we will address the facts as they relate to the errors that require reversal.

trial court awarded disgorgement damages on the claims for breach of fiduciary duty, tortious interference, and civil conspiracy based on tortious interference. See Zippertubing Co. v. Teleflex Inc., 757 F.2d 1401, 1411 (3d Cir. 1985) (holding that the trial court correctly permitted the plaintiffs to prove as damages the amount of the defendant's profits in their claim for tortious interference, because this rule was "consistent with the policy of discouraging tortious conduct by depriving the tortfeasor of the opportunity to profit from wrongdoing"); see also Colo. Interstate Gas Co. v. Nat. Gas Pipeline Co. of Am., 661 F. Supp. 1448, 1479 (D. Wyo. 1987) (holding that plaintiff was entitled to damages relating to the defendant's profits for tortious interference with contract), reversed on other grounds, 885 F.2d 683 (10th Cir. 1989); King Mountain Condo. Ass'n v. Gundlach, 425 So. 2d 569, 572 (Fla. 4th DCA 1982) (noting that disgorgement damages are an equitable remedy). But see Developers Three v. Nationwide Ins. Co., 582 N.E.2d 1130, 1135 (Ohio Ct. App. 1990) ("[A]n award of defendant's profits is not the only means of discouraging a tortfeasor from interfering with a business relationship while calculating that his profits will exceed the injured party's losses."); Marcus, Stowell & Beye Gov't Sec., Inc. v. Jefferson Inv. Corp., 797 F.2d 227, 232 (5th Cir. 1986) (holding that disgorgement damages were not proper for claim of tortious interference).

Again, the failure of the trial court order to specifically indicate whether it was awarding disgorgement damages and, if so, to specify the amount of disgorgement damages hinders this court's review of the award. Regardless, the evidence presented at trial suggests that if the trial court intended to award disgorgement damages, the award was grossly insufficient. The Appellants' expert witness testified that based on

the profits that the Appellees realized up to the trial date, disgorgement damages would be approximately $271,000,000.[2]  See Pidcock v. Sunnyland Am., Inc., 854 F.2d 443, 446 (11th Cir. 1988) ("[O]nce it has been determined that a purchaser acquired property by fraud, any profit subsequently realized by the defrauding purchaser should be deemed the proximate consequence of the fraud.").

The Appellees suggest that the trial court limited the amount of disgorgement damages awarded because the management initiatives of Bill Horne, who became Laser Spine Institute's chief executive officer in November 2005, were part of what made Laser Spine Institute successful.  We agree that a plaintiff generally may not recover disgorgement damages if any portion of the profits is attributable to the defendant's "special or unique efforts . . . other than those for which he is duly compensated."  Siebel v. Scott, 725 F.2d 995, 1002 (5th Cir. 1984) (quoting Nelson v. Serwold, 576 F.2d 1332, 1338 n. 3 (9th Cir. 1978)).  "Aggressive and enterprising management activities may break the causal chain between the fraud and the profits."  Pidcock, 854 F.2d at 447.  However, there is an exception to this rule.  Even if gains in a company's profits are attributable to extraordinary management activities, such profits are still subject to disgorgement if the activities are performed as part of the management's regular salaried responsibilities.  Id. at 448.  "[A]ctions taken by a corporate officer or director do not qualify as 'extra' efforts unless they go well beyond the efforts for which the officer or director is duly compensated."  Lawton v. Nyman, 357 F. Supp. 2d 428, 443 (D.R.I. 2005).

---

[2]The trial court found that Laser Spine Institute's gross revenue from 2005 to 2009 was approximately $283,000,000.

In the present case, the trial court noted that Mr. Horne was a "highly-compensated executive as the CEO of the Laser Spine Institute (LSI), earning $400,000 in salary and $300,000 in bonus" and that his profit distributions from LSI and related entities provided an additional income of $1,500,000 a year. Considering Mr. Horne's income from the Appellees' business, the evidence did not support any finding that his "extra" efforts went well beyond the efforts for which he was duly compensated. The trial court found that Mr. Horne was at work "every day during the first few years of his tenure." He would begin his day at 7:00 a.m. by greeting patients before and after surgery, he would work on sales and marketing during the day, and he would spend his evenings, until 10:00 p.m., calling patient prospects. Although we do not question Mr. Horne's ability to successfully manage the Appellees' business or the fact that he worked long days, it would be difficult to conclude that his efforts in greeting patients in the morning, working on sales and marketing during the day, and calling patient prospects during the evening were efforts that went beyond those for which he was compensated approximately $2,000,000 a year. Therefore, even if the gains in the Appellees' profits are attributable to his extraordinary management activities, such profits are still subject to disgorgement because the activities were efforts for which he was duly compensated. See Pidcock, 854 F.2d at 448.

Punitive Damages

The trial court found that the Appellants did not establish a factual basis for punitive damages. Section 768.72(2), Florida Statutes (2006), provides that "[a] defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of

intentional misconduct or gross negligence." The term "intentional misconduct" was defined by our legislature to mean "that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." § 768.72(2)(a). In turn, "gross negligence" was defined to mean "that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." § 768.72(2)(b).

At trial, a plaintiff is required to establish the entitlement to an award of punitive damages by clear and convincing evidence. § 768.725.

> When claims for punitive damages are made, the respective provinces of the court and jury are well defined. The court is to decide at the close of evidence whether there is a legal basis for recovery of punitive damages shown by any interpretation of the evidence favorable to the plaintiff. . . . Once the court permits the issue of punitive damages to go to the jury, the jury has the discretion whether or not to award punitive damages and the amount which should be awarded.

Wackenhut Corp. v. Canty, 359 So. 2d 430, 435-36 (Fla. 1978) (citation omitted).

We note that this case was tried without a jury and, therefore, the trial court was required to determine, first, whether there was a legal basis for the recovery of punitive damages and, second, whether to award punitive damages and the amount which should be awarded. The language of the order clearly shows that the trial court determined, under the first prong of the test, there was no legal basis for the recovery of punitive damages.

The trial court did not explain its reasoning for this ruling. However, it recognized that "[p]unitive damages are appropriate when a defendant engages in conduct which is fraudulent, malicious, deliberately violent or oppressive, or committed with such gross negligence as to indicate a wanton disregard for the rights of others." W.R. Grace & Co.—Conn. v. Waters, 638 So. 2d 502, 503 (Fla. 1994). We conclude that the factual findings made by the trial court support an award of punitive damages.

The trial court found that Joe Samuel Bailey, Ted Suhl, Dr. James St. Louis, and Dr. Michael Perry formed several businesses: Laserscopic Spinal Centers of America, Inc., and Laserscopic Spine Centers of America, Inc. (the parent holding companies), as well as Laserscopic Spinal Centers of Florida, LLC, Laserscopic Surgery Center of Florida, LLC, Laserscopic Medical Clinic, LLC, and Laserscopic Diagnostic Imaging and Physical Therapy, LLC (collectively referred to as Laserscopic Spinal). All four directors had an ownership interest in Laserscopic Spinal, which was organized to provide minimally invasive spinal surgery. Laserscopic Spinal's business model was unique, and Dr. St. Louis was one of between four and ten surgeons in the country who specialized in endoscopic minimally invasive spine surgery.

Laserscopic Spinal began providing services to patients in August 2004. Revenues for the company showed significant growth results between August and October 2004, and the number of surgical procedures performed increased in each of the three months. Between $75,000 and $100,000 in revenue was generated in August 2004, $250,000 in September 2004, and $650,000 in October 2004.

Laserscopic Spinal met with William Esping, the managing director of EFO Holdings L.P., and Robert Grammen, a partner with EFO, about the possibility of EFO

- 8 -

providing a loan to Laserscopic Spinal. To obtain the loan, Laserscopic Spinal provided a copy of its business plan to Mr. Esping and Mr. Grammen upon the express and agreed condition that the materials would be kept confidential. Laserscopic Spinal also provided its financial information to EFO and allowed EFO to conduct a due diligence investigation on site. After conducting its due diligence, EFO did not offer a loan to Laserscopic Spinal but instead offered to invest $3,000,000 in Laserscopic Spinal in exchange for fifty-five percent interest in the company, permanent control of the board, and a preferential seven percent return on its invested capital with the agreement that no distributions could be made to other investors until EFO's invested capital was repaid. When Mr. Bailey called Mr. Grammen to discuss EFO's unexpected terms, Mr. Grammen told Bailey that "you're going to accept this offer or we're going to take your doctors and we're going to take your company. And we're going to go up the street, and we're going to do it ourselves." EFO made good on its threat.

In order to make Dr. St. Louis and Dr. Perry angry at and suspicious of Mr. Bailey, Mr. Grammen and another individual raised concerns regarding Laserscopic Spinal's expenses, operations, and capitalization without conducting any investigation into such. The records that were provided to EFO during the due diligence period were used by EFO to mislead Dr. St. Louis and Dr. Perry to incorrectly believe that Mr. Bailey was improperly using and misappropriating corporate assets. The trial court found that EFO "intentionally engaged in activities designed to develop a relationship with St. Louis and Perry and cause them to question Bailey's integrity. [It] did this in an effort to leverage [its] position in the negotiations to force a sale of Laserscopic with the support of St. Louis and Perry."

When another individual who had an option to purchase an investor's interest in Laserscopic Spinal refused to sell his option to EFO, Mr. Grammen threatened that they would lose the company. When the investor stated that he would sue if Mr. Grammen and EFO interfered with the business, Mr. Grammen was not concerned and indicated that EFO would make ten times whatever damages they might have to pay in a lawsuit.

Two days after EFO's offer to invest in Laserscopic Spinal, Dr. St. Louis and Dr. Perry told Mr. Bailey that they were leaving Laserscopic Spinal to establish a competing venture with EFO. While Dr. St. Louis and Dr. Perry were owners, officers, directors, and employees of Laserscopic Spinal, they had numerous phone calls with and met privately with Mr. Esping and Mr. Grammen. The trial court found that Dr. St. Louis and Dr. Perry conspired with EFO to establish a competing business. The incorporation documents for the competing business, Laser Spine Institute, LLC, were signed twenty-two days after EFO's offer to invest in Laserscopic Spinal.

Notably, taking Laserscopic Spinal's two physician-officers and setting up a competing business was not all that the Appellees did here.[3] The trial court found that they "made use of Laserscopic's business plan, confidential documents, key personnel including the entire surgical team and other employees, internal forms and documents, and patient leads. Defendants obtained the critical head start and benefit of time and know-how, which gave them a significant advantage in the market." Laser Spine Institute created a business plan, which EFO admitted was a "cut and paste job" of

_____

[3]Dr. Perry had a noncompete agreement with Laserscopic Spinal, but Dr. St. Louis did not have such an agreement with Laserscopic Spinal.

Laserscopic Spinal's confidential business plan that EFO had received during due diligence. Laser Spine Institute then used Laserscopic Spinal's confidential business plan to seek funding from lenders. Laser Spine Institute never created its own comprehensive business plan.

Dr. St. Louis and Dr. Perry falsely told Laserscopic Spinal employees that Mr. Bailey was stealing corporate assets. Dr. St. Louis also told employees that Mr. Bailey had many aliases, was a wanted felon, and had "possible" sexual offenses. The trial court specifically found that all of these allegations were false and, furthermore, "[there was] no evidence that St. Louis and Perry had a good faith belief the statements about Bailey were accurate at the time that they were made."

But it was not enough to gut Laserscopic Spinal, the Appellees deboned it with surgical skill. Dr. St. Louis, Dr. Perry, and EFO paid numerous employees to quit working at Laserscopic Spinal and continued to pay them until Laser Spine Institute was ready to open. Dr. Perry also incited employees to quit by falsely telling them that Mr. Bailey was going to fire them. Dr. St. Louis told one employee to stop scheduling surgeries, which directly affected at least ten patients. Laserscopic Spinal's list of patient lists and leads, accounts payable information, and operating room supplies were also misappropriated. As many as thirty to forty patients of Laserscopic Spinal were scheduled for surgery by Laser Spine Institute. Patients of Laserscopic Spinal were sent a notice by Laser Spine Institute stating that their clinic had simply moved locations. Laser Spine Institute created a patient success story advertisement, which actually featured a patient of Laserscopic Spinal.

After Dr. St. Louis and Dr. Perry left Laserscopic Spinal, Mr. Bailey sought to hire another surgeon who specialized in minimally invasive spine surgery. Dr. St. Louis and Dr. Perry contacted that surgeon and discouraged him from joining Laserscopic Spinal. Mr. Grammen also contacted the surgeon and stated that he believed Laserscopic Spinal would fail and offered to pay the surgeon not to work for Laserscopic Spinal.

In a similar, but less egregious case, this court found that the trial court erred in finding that the facts did not support an award of punitive damages. In Mortellite v. American Tower, L.P., 819 So. 2d 928, 931 (Fla. 2d DCA 2002), the majority shareholder of a company did not disclose to the minority shareholder that there was an offer to purchase one hundred percent of the company's stock. Instead, the majority shareholder convinced the minority shareholder to sell him his interest in the company for a fraction of what it was worth. Id. A week later, the company was sold to the third party. Id. This court held that punitive damages were appropriate for the breach of fiduciary duty claim. Id. at 935; see S & S Toyota, Inc. v. Kirby, 649 So. 2d 916, 917 (Fla. 5th DCA 1995) (holding that punitive damages were properly awarded where Toyota misrepresented the vehicle it sold to Appellee as a one-owner, low-mileage, used car with 26,000 miles when the vehicle actually had six prior owners and Toyota was informed that the odometer reading was inaccurate).

In this case, the Appellees' "behavior transcends the level of simple negligence, and even gross negligence, and enters the realm of wanton intentionality, exaggerated recklessness, or such an extreme degree of negligence as to parallel an intentional and reprehensible act." Am. Cyanamid Co. v. Roy, 498 So. 2d 859, 861 (Fla.

1986) (citation omitted). The factual findings made by the trial court support an award of punitive damages against Dr. St. Louis, Dr. Perry, EFO Holdings L.P., and EFO Genpar, LP. We reverse for the trial court to determine the appropriate amount of punitive damages, if any, to award the Appellants. See <u>Wackenhut Corp.</u>, 359 So. 2d at 435-36.

<u>FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT</u>

Despite the fact that the trial court found that many actions of EFO Holdings and EFO Genpar violated the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), it found that the Appellants were entitled to only injunctive relief against the two Appellees pursuant to section 501.211(2), Florida Statutes (2006), because it was a competitor and not a consumer.

One purpose of FDUTPA is to protect "the consuming public *and* legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2) (emphasis added). This section, by legislative directive, is to be construed liberally to promote the above policy. § 501.202. The Appellants' FDUTPA claim is based on section 501.211, which authorizes a private cause of action for injunctive relief, § 501.211(1), and damages, § 501.211(2).

Prior to 2001, section 501.211 provided as follows:

(1) Without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part.

- 13 -

(2) In any individual action brought by a *consumer* who has suffered a loss as a result of a violation of this part, such consumer may recover actual damages, plus attorney's fees and court costs as provided in s. 501.2105 . . . .

(Emphasis added.)

Based on the plain language of this version of the statute, courts have determined that competitors could seek declaratory relief under section 501.211(1), but that only consumers could seek damages under section 501.211(2). See Del Monte Fresh Produce Co. v. Dole Food Co., 136 F. Supp. 2d 1271, 1295 (S.D. Fla. 2001); see also Warren Tech., Inc. v. Hines Interests Ltd. P'ship, 733 So. 2d 1146, 1148 (Fla. 3d DCA 1999).

However, effective July 1, 2001, the legislature amended section 501.211(2), Florida Statutes (2001), by inserting the word "person" in place of the word "consumer": "In any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs as provided in s. 501.2105."

As noted by Niles Audio Corp. v. OEM System Co., 174 F. Supp. 2d 1315, 1319-20 (S.D. Fla. 2001), "the Florida Legislature's replacement of the word consumer with the word person, demonstrates an intent to allow a broader base of complainants, including competitors such as [the appellant], to seek damages." (Emphasis omitted.) In Niles Audio Corp, the court found that the appellant could bring a claim for both damages and declaratory relief pursuant to section 501.211. Id. at 1320; see also In re G-Fees Antitrust Litig., 584 F. Supp. 2d 26, 44 (D.D.C. 2008) (finding that the 2001 amendment allowing a damages action by any "person" eliminated the requirement that an action for damages had to be brought by a consumer); Furmanite Am., Inc. v. T.D.

- 14 -

Williamson, Inc., 506 F. Supp. 2d 1134, 1146-47 (M.D. Fla. 2007) (holding that plaintiff had standing to bring FDUTPA claim for damages against the defendant, a competitor, for the misappropriation of trade secrets and confidential information).

We agree that section 501.211(2) evinces a legislative directive that the remedy of damages is not limited to a consumer. "When the Legislature makes a substantial and material change in the language of a statute, it is presumed to have intended some specific objective or alteration of law, unless a contrary indication is clear." Mangold v. Rainforest Golf Sports Ctr., 675 So. 2d 639, 642 (Fla. 1st DCA 1996).

CONCLUSION

We reverse the final judgment as to the award of damages and remand for the trial court to award either out-of-pocket or disgorgement damages and specifically note the basis for the amount of such award. The trial court must also revisit the issue of punitive damages because there is clearly a factual basis for such, and it must determine the appropriate amount of punitive damages, if any, to award the Appellants. Finally, the trial court must determine the amount of damages that are appropriate for the violations by EFO Holdings and EFO Genpar of FDUTPA. The final judgment is otherwise affirmed.

LaROSE and SALARIO, JJ., Concur.