IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

WERNER ENTERPRISES, INC.,

     Appellant,

v.

     Case No. 5D23-235
     LT Case No. 16-2020-CA-005745

CARSON MENDEZ, WILLIAM B.
STALLINGS, AND AJC LOGISTICS, LLC,

     Appellees.

_____/

Opinion filed June 2, 2023

Nonfinal Appeal from the Circuit Court
for Duval County,
Robert M. Dees, Judge.

Gregory A. Hearing, Benjamin W. Bard
and Kevin M. Sullivan, of GrayRobinson,
P.A., Tampa, for Appellant.

Henry M. Coxe, III, Michael E. Lockamy
and John G. Woodlee, of Bedell, Dittmar,
DeVault, Pillans & Coxe, P.A.,
Jacksonville, for Appellees, Carson
Mendez and William B. Stallings.

Edward B. Carlstedt, of FordHarrison LLP, Tampa for Appellee, AJC Logistics, LLC.

PER CURIAM.

Werner Enterprises, Inc. ("Werner"), sued two of its former employees for tortious interference, breach of the duty of loyalty, and civil conspiracy. In the civil conspiracy count, Werner also sued the business where the two employees went to work after they resigned from Werner.

Werner moved to amend its complaint to seek punitive damages. The trial court denied the motion, finding that Werner failed to make a reasonable showing of having a reasonable basis for recovering punitive damages. We reverse.

I.

Werner is a logistics provider. AJC Logistics, LLC ("AJC"), is one of Werner's competitors. Carson Mendez and William Stallings held managerial roles in Werner's Jacksonville office.

Werner alleged that in 2019, Mendez and Stallings—while they were still employed by Werner—conspired with AJC management to solicit several of Werner's Jacksonville employees to resign their employment and move to AJC. Werner alleged that the purpose of this effort was to undermine Werner's business by establishing a new AJC office in Jacksonville that

2

would be staffed by experienced Werner employees and serve Werner's customers. Werner alleged that Appellees referred to their plan as "Project Satellite."

Werner sought the trial court's permission to amend its complaint to seek punitive damages. In support of its motion for leave to amend, Werner proffered numerous e-mail and text message conversations involving Mendez, Stallings, and senior AJC officers.

For example, on September 3, 2019, Stallings sent an e-mail to AJC's controller. He wrote that he looked forward to talking with AJC more as "'Project Satellite' continues to develop." He attached a "90 Day Roll Out" plan that called for recruiting seven of Werner's "core" employees and included a projection of revenue that the new office would generate for AJC in the first year.

That same day, AJC's controller and managing director sent a memo to AJC's president. They reported that by hiring a team of experienced Werner employees, AJC could "potentially double" its surface transportation division "with minimal risk and up front investment." The memo conveyed Stallings' estimate that the team would produce $10 million in revenue without requiring AJC to "risk" the "outlay of an acquisition." The memo indicated that Appellees began discussing the project on August 4, 2019.

On September 16, 2019, Stallings e-mailed AJC's controller and managing director to tell them that he and Mendez had an appointment to look at two properties that could accommodate five to ten employees. That same day, AJC's controller e-mailed Stallings to ask about which of Werner's clients he and Mendez would be bringing with them to AJC. The message acknowledged that this disclosure might breach Stallings' duty to Werner, but also indicated the information would benefit the project: "While the names of the initial customers would be extremely helpful, I also understand that while you are currently employed, this may be a direct breach of your employment. However, whatever you feel comfortable telling us that you think will fast track our credit team will be helpful."

On September 24, 2019, Stallings provided the names of thirteen of Werner's clients that he expected to join AJC's new operation within ninety days. The list included several large, recognizable corporations. Stallings identified how much revenue each entity would generate. He also named thirteen other clients that would be "likely early account targets." He stated that getting a "head start on establishing credit for this inventory of accounts will be a big help."

The following day, AJC's controller and managing director sent a memo to AJC's board of directors. They reported that they "covet[ed] the

Board's support and insight" about "a unique opportunity to grow the Surface Transportation division of AJC Logistics by hiring a team of individuals who have proven the ability to succeed." The memo proposed hiring a team of nine employees, who were "the 'A' players from the Jacksonville office of Werner Logistics." The memo included revenue, margin, and volume figures from Werner's Jacksonville operation. As AJC's controller had previously suggested, the memo advertised that the project offered "the benefits of an acquisition, but without the upfront investment." The memo also gave a grim assessment of what Werner's Jacksonville operation would be like after Project Satellite: "The team believes many customers (primarily dry) will follow them as they have strong relationships, some for 10+ years, and the remaining Werner employees will not be able to support good customer service."

On October 4, 2019, AJC's controller informed Mendez, Stallings, and AJC's managing director that AJC had "added some contingent legal fees" to the project's budget, "just in case Werner decides to make this an issue." The message continued, "In consulting our attorneys we don't believe [Werner has] a legal ground to stand on but [we] want to be responsible in our financial planning." On October 8, 2019, AJC's controller e-mailed Mendez and Stallings to discuss the logistics of Werner's employees joining

5

AJC. In reference to the timing of Mendez and Stallings accepting employment offers from AJC, she wrote, "We want to protect you while you are still Werner employees so we either need your acceptance earlier or the written offers [to the solicited Werner employees] need to come directly from us."

Over the course of October 13, 14, and 15, 2019, Mendez and Stallings conferred by text message with AJC's managing director about the progress of their efforts to recruit the targeted Werner employees. These messages included discussions about what compensation would be required to secure the employees' commitments. In one message, Stallings listed the expected start date for each employee. In another message, Mendez reported that he had spoken with an employee "a lot" about the opportunity and what the employee would be paid at AJC. Mendez also conveyed that another employee was "very excited" and "on board" with joining AJC.

Mendez resigned from Werner on October 18, 2019. His resignation letter indicated that he was leaving Werner's Jacksonville office in the "very capable hands" of Stallings and another employee. He also reported that he "spoke with the team and tried to inspire as much confidence as possible that they can carry on without me." Stallings resigned two weeks later. On November 12, 2019, Werner announced that it would close the Jacksonville

office where Stallings and Mendez had worked.

The trial court held a hearing on Werner's motion for leave to amend. Werner argued that Appellees' actions were "nothing short of corporate espionage" and an "outright theft of Werner's business." Werner alleged that Appellees launched Project Satellite to reap the benefits of buying Werner's Jacksonville office without having to pay any money to Werner. Werner claimed its proffer showed that Appellees "conspired with each other to assist Mendez and Stallings in breaching their duty of loyalty to Werner" by disclosing confidential business information and tortiously interfering with Werner's customer and employee relationships. Werner reiterated that Appellees planned Project Satellite while Mendez and Stallings were still Werner employees. Werner also emphasized that Project Satellite received approval from AJC's board of directors and executive officers.

The trial court found that Werner's proffer failed to make a reasonable showing of Appellees' intentional misconduct or gross negligence. As such, the court denied Werner's motion for leave to amend its complaint to seek punitive damages.

## II.

We review the trial court's ruling de novo. *Grove Isle Ass'n, Inc. v. Lindzon*, 350 So. 3d 826, 829 (Fla. 3d DCA 2022).

7

A.

Our analysis begins with what a plaintiff must do at the leave to amend stage. Florida law requires the plaintiff to seek the trial court's permission before adding punitive damages to its complaint. § 768.72(1), Fla. Stat. (2022); *see also Bistline v. Rogers*, 215 So. 3d 607, 611 (Fla. 4th DCA 2017) (noting that the "statute requires the trial court to act as a gatekeeper"). To obtain this permission, the plaintiff must make "a reasonable showing" of having "a reasonable basis" for the recovery of punitive damages. § 768.72(1), Fla. Stat. The showing can be based on evidence in the record or evidence proffered by the plaintiff. *Id.* "Proffered evidence is merely a representation" of the evidence that a party proposes to present at trial. *See Grim v. State*, 841 So. 2d 455, 462 (Fla. 2003).

When deciding if the plaintiff has made the required "reasonable showing" of a "reasonable basis" for recovering punitive damages, the trial court makes a legal determination that is "similar to the standard that is applied to determine whether a complaint states a cause of action." *Est. of Despain v. Avante Grp., Inc.*, 900 So. 2d 637, 644 (Fla. 5th DCA 2005); *see also Holmes v. Bridgestone/Firestone, Inc.*, 891 So. 2d 1188, 1191 (Fla. 4th DCA 2005) ("When a trial court is determining if a plaintiff has made a 'reasonable showing' under section 768.72 for a recovery of punitive

8

damages, it is similar to determining whether a complaint states a cause of action, or the record supports a summary judgment . . . ."). Thus, the court asks "whether a reasonable jury could infer" from the proffer that the defendant's conduct satisfies the statutory criteria for punitive damages. *See Varnedore v. Copeland*, 210 So. 3d 741, 747 (Fla. 5th DCA 2017). When completing this task, the court views the proffer in a light most favorable to the plaintiff. *See Est. of Despain*, 900 So. 2d at 644.

Substantively, punitive damages are reserved for cases in which a defendant is "personally guilty of intentional misconduct or gross negligence." § 768.72(2), Fla. Stat. "Intentional misconduct" happens when a defendant has "actual knowledge of the wrongfulness of the conduct and the high probability" that it will harm the plaintiff, but nevertheless "intentionally pursued that course of conduct," resulting in said harm. § 768.72(2)(a), Fla. Stat. "Gross negligence" occurs when a "defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." § 768.72(2)(b), Fla. Stat. A corporation can incur liability for punitive damages based on the actions of its managing agents. *See Schropp v. Crown Eurocars, Inc.*, 654 So. 2d 1158, 1159–61 (Fla. 1995); *Wells Fargo Bank, N.A. v. Elec. Funds Transfer Corp.*, 326 So. 3d 753, 757 (Fla. 5th DCA

9

2021); *Fla. Power & Light Co. v. Dominguez*, 295 So. 3d 1202, 1205 (Fla. 2d DCA 2019).

B.

We now examine how these standards apply in this case. An employee owes a duty of loyalty to his employer. *See Fish v. Adams*, 401 So. 2d 843, 845 (Fla. 5th DCA 1981). An employee does not violate that duty "when he merely organizes a corporation during his employment to carry on a rival business after the expiration of his employment." *Id.* "However, that employee may not engage in disloyal acts in anticipation of his future competition, such as using confidential information acquired during the course of his employment or soliciting customers and other employees prior to the end of his employment." *Id.* A business can be liable for civil conspiracy when it induces another business's employees to breach the duty they owe to their employer. *See Sec. Title & Abstract, Inc. v. First Am. Title Ins. Co.*, 414 So. 2d 604, 604–05 (Fla. 1st DCA 1982). Moreover, these business torts can warrant punitive damages. *See, e.g.*, *Bailey v. St. Louis*, 196 So. 3d 375 (Fla. 2d DCA 2016).

In *Bailey*, the plaintiffs' complaint alleged claims for, *inter alia*, breach of fiduciary duty, civil conspiracy, and tortious interference. *Id.* at 376. The plaintiff business had approached the defendant business about the

10

possibility of securing a loan. *Id.* at 380. As part of the underwriting process, the plaintiff business provided confidential financial records. *Id.* After conducting due diligence, the defendant business did not offer a loan, but instead offered to buy a majority stake in the plaintiff business. *Id.* An agent of the defendant business told an agent of the plaintiff business that "you're going to accept this offer or we're going to take your doctors and we're going to take your company." *Id.*

When the plaintiff business refused, the defendant business "made good on its threat." *Id.* It did so by falsely leading some members of the plaintiff business to believe their colleagues were misappropriating corporate assets. *Id.* In turn, those members—while still working for the plaintiff business—started conspiring with the defendant business against the plaintiff business. *Id.* at 381. They used the plaintiff business's confidential documents, customer leads, and key personnel to benefit the defendant business. *Id.* Ultimately, the defendant business paid members of the plaintiff business to not work, incited other employees to quit their jobs by falsely telling them that the plaintiff business was about to fire them, and fraudulently induced customers of the plaintiff business to unwittingly become customers of the defendant business. *Id.* On this record, the Second District Court reversed the trial court's finding that the plaintiff business failed to establish

11

a factual basis for punitive damages. *Id.* at 379, 382.

The facts in *Bailey* overlap considerably with the proffer in this case. Both cases involve a subversive takeover of a target business by a competing business. In each case, the competing business relied on target business employees providing sensitive customer/financial records and inducing fellow target business employees to resign their employment. While defamation is not a feature of this case as it was in *Bailey*, one could reasonably argue that Appellees' conduct in this case was in some ways worse than the conduct in *Bailey*. In *Bailey*, the plaintiff business willingly provided documents to the defendant business for the purpose of obtaining a loan. While the defendant business later misused the documents, the initial disclosure was nevertheless a voluntary one. By contrast here, Werner did not know that two of its employees were furnishing sensitive customer and employee information to AJC. Moreover, in *Bailey*, the defendant business did at least make an offer to buy the plaintiff business. Here, AJC was attracted to Project Satellite because it allowed AJC to enjoy all "the benefits of an acquisition" without having to make an "upfront investment."

In finding that Werner's proffer was insufficient to receive leave to amend, the trial court adopted Appellees' explanation of several of the key messages in Werner's proffer. For example, with respect to the e-mail where

12

AJC's controller asks Stallings for the names of Werner customers that would follow him to AJC, the court wrote that the message "suggests an intention to avoid the sharing of any information that Defendant Stallings believed he could not provide without breaching his obligations to Plaintiff." A reasonable jury might well view the message that way. However, such a jury could instead find that even though AJC knew the information it requested was sensitive and would likely violate Stallings' duty to Werner, it asked for the information anyway because the business upside was worth the legal risk. At the leave to amend stage, it is not for us to definitively forecast which view a jury will take, but only to determine if there is a reasonable view of the evidence that supports the plaintiff's position. *See Varnedore*, 210 So. 3d at 747 (observing that when deciding if a proffer is successful, the court asks whether a reasonable jury could infer from the proffer that the defendant's conduct satisfies the statutory basis for punitive damages).

Similarly, regarding the closure of Werner's Jacksonville office, the trial court found that the "evidence proffered is, at best, equally consistent with Defendants' position that Plaintiff had already adopted a plan to close the branch." However, at the leave to amend stage, a court should view this conflict in a light most favorable to the plaintiff. *See Est. of Despain*, 900 So. 2d at 644.

## III.

Taken in a light most favorable to Werner, its proffer shows that Project Satellite was a trojan horse operation to transform Werner's Jacksonville office into AJC property without payment to Werner. Again, in a light most favorable to Werner, this transformation occurred because two of Werner's employees, secretly working in concert with AJC's executive officers and board of directors, provided AJC with sensitive information about Werner's customers and induced key Werner employees to resign their employment and work for AJC. This is not to suggest that a jury *will* ultimately find for Werner on these issues. We merely hold that a reasonable jury *could* credit the proffered evidence as demonstrating Appellees' intentional misconduct and/or gross negligence. *See Varnedore*, 210 So. 3d at 747.

Because Werner made a "reasonable showing" of having a "reasonable basis" for the recovery of punitive damages, we reverse the trial court's order denying leave to amend and remand with instructions to grant the motion. *See* § 768.72(1), Fla. Stat.

REVERSED and REMANDED with instructions.

LAMBERT, C.J., JAY and SOUD, JJ., concur.

14