DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

SONEET R. KAPILA, as assignee of LASER SPINE
INSTITUTE, LLC,

Appellant,

v.

CTS EQUITIES LIMITED PARTNERSHIP,

Appellee.

No. 2D2024-0334
_____

August 6, 2025

Appeal from the Circuit Court for Hillsborough County; Darren David
Farfante, Judge.

Steven L. Brannock, Joseph T. Eagleton, and Sarah B. Roberge of
Brannock Berman & Seider, Tampa; Paul J. Battista, Gregory M. Garno,
and Patrick T. Kalbac of Venable, LLP, Miami; and Robert L. Rocke,
Jonathan B. Sbar, Raul Valles, Jr., and Andrea K. Holder of Rocke,
McLean & Sbar, P.A., Tampa, for Appellant.

Marie A. Borland, Dennis P. Waggoner, and Joshua C. Webb of Hill,
Ward & Henderson, P.A., Tampa, for Appellee.

MORRIS, Judge.

Soneet R. Kapila, as assignee of Laser Spine Institute, LLC (LSI),

appeals a final summary judgment entered in favor of CTS Equites

Limited Partnership (CTS) on Kapila's complaint against CTS filed under

Florida's Uniform Fraudulent Transfer Act (UFTA), chapter 726, Florida Statutes (2019). We affirm for the reasons explained below.

I. Background

On November 8, 2019, Kapila filed the underlying complaint, alleging three counts for the avoidance and recovery of transfers pursuant to UFTA, sections 726.105(1)(a), 726.105(1)(b), 726.106(1), 726.108, and 726.109. Kapila had obtained an assignment for the benefit of creditors from LSI Holdco, LLC (Holdco), LSI's parent holding company.[1] Kapila alleged that Holdco had received a $150,000,000 loan from Texas Capital Bank (TCB) with the intention of making $110,000,000 in distributions to Holdco's owners, including CTS.[2] Kapila alleged that the distributions were made "in order to 'take money off the table' " while LSI was facing millions of dollars in damages in pending litigation.[3] Kapila alleged that the distributions were fraudulent and rendered LSI insolvent and sought to recover $2,640,144 from CTS.

---

[1] On March 14, 2019, Holdco executed and delivered to Kapila an assignment for the benefit of creditors. That same day, Kapila filed a petition in circuit court, commencing a proceeding for the assignment for the benefit of creditors pursuant to chapter 727, Florida Statutes (2018).

[2] Kapila filed separate lawsuits against EFO Laser Spine Institute, Ltd. (EFO), and RDB Equities Limited Partnership (RDB) alleging that they had also received distributions that were fraudulent transfers. The trial courts entered summary judgments against Kapila in those cases, and Kapila appeals those judgments in cases 2D2024-234 and 2D2024-314. Separate records were prepared, and separate briefing was conducted. But the appeals were consolidated for the purposes of oral argument.

[3] LSI and its affiliated entities were involved in complex litigation with one of its founders. In 2016, this court reversed a damages award and remanded for the trial court to revisit damages in three respects. *Bailey v. St. Louis*, 196 So. 3d 375, 383 (Fla. 2d DCA 2016) (reversing and remanding "for the trial court to award either out-of-pocket or disgorgement damages and specifically note the basis for the amount of

2

CTS filed a motion for summary judgment, alleging that at the time of transfer, the funds were encumbered by a valid lien under the loan documents and therefore could not be considered fraudulent transfers under subsections 726.102(14) and 726.102(2)(a). Kapila responded that the subject funds could not be encumbered by the alleged lien because the primary purpose of the loan was to provide for distributions to Holdco's owners. Kapila argued that if TCB ever had a security interest in the funds under the loan documents, it ended as soon as the distributions were made. Kapila contended that by agreeing that the loan would be used for the distributions, TCB "released" its liens on the funds when the funds were distributed as intended.

In granting summary judgment, the trial court found that the following facts were undisputed:

> b) LSI [and other affiliated entities] (collectively, the "Borrowers") and Texas Capital Bank, N.A., as agent ("TCB"), and the other lenders who are parties thereto (collectively with TCB, the "Lenders") are parties to a Credit Agreement dated July 2, 2015 (the "Credit Agreement"). Pursuant to the Credit Agreement, the Lenders made a loan facility available to the Borrowers that provided them with, among other things, (i) $50,000,000.00 in Revolving Loan Commitments, and (ii) $150,000,000.00 in Term Loan Commitments.
> c) Under the Credit Agreement, TCB specifically agreed that the proceeds from the Dividend Loan would be distributed to the equity members of Holdco.

---

such award," to "revisit the issue of punitive damages" and to "determine the appropriate amount of punitive damages, if any, to award," and to "determine the amount of damages that are appropriate for the violations" of the Florida Deceptive and Unfair Trade Practices Act). In 2018, this court reversed the damages award entered on remand from the first appeal with directions for the trial court "to enter an award of disgorgement" between the amounts of $264 million and $265 million and an award of out-of-pocket damages in the amount of $6,831,172. *Bailey v. St. Louis*, 268 So. 3d 197, 202-03, 203 n.4 (Fla. 2d DCA 2018).

d) The Credit Agreement defined the Closing Date Distribution as the "cash distribution by Parent to its shareholders on the Closing Date or within thirty (30) days thereafter in the amount of $115,000,000, less the amount of payments made under the Ownership Appreciation Plan on the Closing Date or within thirty (30) days thereafter."

e) On July 2, 2015, Holdco [and numerous affiliated entities] (each, a "Guarantor" and collectively with the Borrowers, the "Obligors") executed a Guaranty Agreement (the "Guaranty") in favor of the Lenders thereby guaranteeing the obligations of the Borrowers under the Credit Agreement. The Guaranty provides that it is "an absolute, irrevocable and unconditional guaranty of payment and performance."

f) To secure repayment of the Obligations under the Credit Agreement and Guaranty, the Obligors executed and delivered to the Lenders: (i) a Security Agreement, and (ii) a Pledge Agreement, each dated as of July 2, 2015.

g) Pursuant to the Security Agreement and the Pledge Agreement, each of the Obligors, including LSI Management and Holdco, granted to TCB, as agent, a first priority lien on, and security interest in, substantially all of their assets (collectively, the "Collateral"). The Collateral includes their Deposit Accounts and "including all funds, monies, certificates, checks, drafts, wire transfer receipts, and other earnings, profits, or other Proceeds from time to time representing, evidencing, deposited into, or held in Deposit Accounts." The Deposit Accounts are listed on Exhibit A to the Pledge Agreement and Schedule 3.10 to the Security Agreement. Each of the Deposit Accounts was maintained at TCB.

h) The Deposit Accounts pledged to TCB, as agent, include the Deposit Accounts maintained by Holdco . . . and LSI Management . . . maintained at TCB, which were the accounts from which Plaintiff alleges the Transfers were made.

i) On July 6, 2015, LSI Management transferred $115,000,000.00 from its account at TCB . . . to Holdco's account at TCB . . . in two $57,500,000 million wire transfers. Consistent with Section 6.10 of the Credit Agreement, TCB deposited the $115,000,000 of the Dividend Loan proceeds into LSI Management's [TCB] account for the express purpose

4

of making distributions to Holdco's members, including the Distributions to CTS.

j) Later that same day, on July 6, 2015, Holdco transferred $2,604,297.00 from its account at TCB (the "Holdco TCB Account") to [CTS] as a distribution. On October 23, 2015, Holdco transferred $30,880.00 from the Holdco TCB Account to [CTS] as a distribution. Additionally, Holdco paid $4,968.00 to taxing authorities for [CTS] from funds reserved from the July and October 2015 distributions.

k) On September 4, 2020, [Kapila], in his capacity as assignee, filed a motion (the "TCB Settlement Motion") in the LSI Assignment Case seeking approval of the Stipulation of Settlement Between Assignee and [TCB], as Administrative Agent for the Lender Group (the "Stipulation"). . . . Pursuant to the Stipulation, the Assignee acknowledged, among other things, that: (a) immediately prior to the filing of the LSI Assignment Case, the Assignors maintained their funds in the Deposit Accounts on which TCB holds a security interest . . . ; and (b) "[t]he Assignee stipulates that the Liens created by the Credit Agreement and any other Loan Documents are valid, binding, enforceable, properly perfected, non-avoidable, first priority liens on the Collateral with priority over any and all other liens, security interests or other interests and are not subject to any challenge or defense and that the Agent and the Lenders hold a valid, enforceable, and allowable claim against the Assignors, as of the Petition Date, in an aggregate amount equal to at least $154,984,093.95 . . . of unpaid principal, plus any and all interest, fees, costs, expenses, charges and other claims, debts or obligations of the Assignors to the Agent and Lenders that has accrued as of the Petition Date under the Loan Documents and applicable law[.]" The Collateral pledged by the Security Agreement and Pledge Agreement includes the Deposit Accounts. On October 22, 2020, the Court entered in the LSI Assignment Case the Order Granting Assignee's Motion for Order Authorizing Compromise of Controversy with [TCB] as Administrative Agent for Lender Group approving the Stipulation.

(Citations omitted.)

After reciting the foregoing undisputed facts and acknowledging the competing arguments of the parties, the trial court ruled that under

5

the language of the pledge and security agreements, Holdco pledged and granted to TCB a security interest in each of the Deposit Accounts, which included the funds at issue that were deposited into such accounts. The court concluded that

> the funds in Holdco's account were undisputedly subject to TCB's lien at the time they were transferred. As a result, the funds transferred were subject [to] TCB's valid lien and were not available to pay creditors. For the foregoing reasons, [CTS] is entitled to final summary judgment against [Kapila] as to all remaining counts.

The trial court entered final summary judgment against Kapila, and Kapila now appeals.

II. Analysis

On appeal, Kapila argues that UFTA only excludes from the definition of an "asset" property that is *presently* encumbered by a lien and that the funds at issue are not presently encumbered. Kapila argues that they became unencumbered after they were distributed to Holdco's owners. Kapila further contends that TCB never intended to have a lien over those funds as the funds were never intended to remain in the Deposit Accounts.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fla. R. Civ. P. 1.510(a) (2023). We review de novo an order granting summary judgment. *See Smith v. Lynch,* 403 So. 3d 433, 435 (Fla. 2d DCA 2025). We also review de novo issues of statutory and contract interpretation. *See Lopez v. Hall*, 233 So. 3d 451, 453 (Fla. 2018); *Verandah Dev., LLC v. Gualtieri*, 201 So. 3d 654, 657 (Fla. 2d DCA 2016) (citing *Syvrud v. Today Real Est., Inc.,* 858 So. 2d 1125, 1129 (Fla. 2d DCA 2003)).

6

Kapila sought to recover the $2,640,144 that Holdco paid to CTS on the basis that the payments were fraudulent transfers under UFTA. UFTA "allows a creditor to unwind a transfer of the debtor's property to a third party—and thus to use the property to satisfy its claims against the debtor—when the act deems the transfer 'fraudulent' as to creditors." *Nat'l Auto Serv. Ctrs., Inc. v. F/R 550, LLC*, 192 So. 3d 498, 504 (Fla. 2d DCA 2016).  Under UFTA, " '[t]ransfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an *asset* or an interest in an *asset*."  § 726.102(14) (emphasis added).  The UFTA further defines "[a]sset" as "property of a debtor," but it does not include "[p]roperty to the extent it is encumbered by a valid lien."  § 726.102(2)(a).  Thus, "for a transaction to be considered a fraudulent transfer under the UFTA, the property being transferred must qualify as an asset," but property does not qualify as an asset if it was " 'encumbered by a valid lien' at the time of the transfer." *2-Bal Bay Props., LLC v. Asset Mgmt. Holdings, LLC*, 291 So. 3d 617, 620 (Fla. 2d DCA 2020).

Kapila does not dispute that under the language of the pledge and security agreements, Holdco pledged and granted to TCB a lien on the funds that were deposited into Holdco's accounts at TCB.[4]  But he

[4] The pledge agreement provides in relevant part as follows:

> As collateral security for the Secured Obligations, each Grantor hereby pledges and grants to Secured Party (including its Affiliates), a first priority Lien on security interest in and to, and agrees and acknowledges that [TCB] has and shall continue to have, a Security Interest in and to, and assigns, transfers, pledges and conveys to Secured Party, all of such Grantor's right, title and interest in and to the Investments, Pledged Equity Interests, Investment Related Property, Deposit Accounts, including all funds, monies, certificates, checks, drafts, wire transfer receipts, and other

argues that because all parties intended for the funds to be used for distributions to Holdco's owners, the parties did not intend for the funds to be subject to a lien after they were distributed. He argues that once the distribution transfer was completed, the funds were no longer encumbered by a lien.

However, we do not look to whether the funds were encumbered *after* the transfer. *See 2-Bal Bay Props.*, 291 So. 3d at 620 (holding that because the evidence showed that when the defendant transferred the subject property to a third party, a bank "had a valid lien encumbering the property" and that the plaintiff therefore "failed to prove by competent, substantial evidence that the property qualified as [defendant's] 'asset' [under section 726.102(2)] because the property was

---

earnings, profits, or other Proceeds from time to time representing, evidencing, deposited into, or held in Deposit Accounts and Stock Rights and Proceeds (the "Collateral') now owned or hereafter acquired, wherever located, howsoever arising or created and whether now existing or hereafter arising, existing or created.

The security agreement provides in relevant part as follows:

**Security Interest.** To secure the prompt and complete payment and performance of the Secured Obligations when due . . ., each Grantor hereby grants to Secured Party a continuing security interest in, a Lien upon, and a right of set off against, and hereby assigns to Secured Party as security, all personal property of such Grantor, whether now owned or hereafter acquired or existing, and wherever located (together with all other collateral security for the Secured Obligations at any time granted to or held or acquired by Secured Party, collectively, the "Collateral'), including:

(a) Accounts;

        . . . .

(d) Deposit Accounts, Securities Accounts, and Commodity Accounts . . . .

8

'encumbered by a valid lien' *at the time of the transfer*" (emphasis added)). "The proper time to evaluate whether the property was encumbered is prior to the transfer," when the property belonged to Holdco and resided in the TCB accounts. *See Thermo Credit, LLC v. DCA Servs., Inc.*, 755 Fed. App'x 450, 456 (6th Cir. 2018). In *Thermo Credit, LLC*, a case filed under Ohio's UFTA, the court rejected plaintiff's argument that the encumbrance vanished when the property was given to the third-party in payments. *Id.* The court recognized that although the plaintiff "is correct that [the third-party] took the payments free of [the] security interest," "the fact that [the third-party] took the payments free of [the security] interest does not mean that they were free of encumbrances *at the time of payment . . .* [as t]he proper time to evaluate whether the property was encumbered is prior to the transfer." *Id.* at 455-56 (citing Ohio Rev. Code Ann. § 1309.332 as providing that "cash or funds from a deposit account are generally transferred free of security interests"). The court noted that because Ohio's UFTA defined "asset" as "property of a debtor,"

> the payments to [the third-party] could only be assets if they belonged to [the debtor] at the time of transfer, *i.e.*, if they were [the debtor's] "property." This seems obvious. But in arguing that the payments were free of encumbrances, [the plaintiff] asks us to look at whether the property was encumbered after the transfer—and thus after it had ceased being [the debtor's] property. We decline to view the payments as [the debtor's] property for one purpose but as [the third-party's] property for another purpose. The proper time to evaluate whether the property was encumbered is prior to the transfer, when it was in [the debtor's] possession and control.

*Id.* (citing Ohio Rev. Code Ann. § 1336.01(B)); *see also Am. Fed. Bank v. W. Cent. Ag Servs.*, 530 F. Supp. 3d 780, 788 (D. Minn. 2021) (relying on *Thermo Credit, LLC*, and holding that payment made by debtor to defendant bank was not subject to Minnesota's version of UFTA because

9

the funds were fully encumbered by another bank's perfected security interest before the debtor transferred the payment to the defendant bank because the "definition of 'asset' requires determining whether the property at issue is encumbered before transfer, when it is property of the debtor" (citing Minn. Stat. § 513.41(2)(i)).

Section 726.102(2)(a) requires the asset to be "property of a debtor" that is not "encumbered by a valid lien." At the time that the funds were property of Holdco, the debtor, they were encumbered by TCB's valid lien. The funds were encumbered by a lien at the time Holdco made the distributions to CTS. Therefore, the funds used for the distributions were not assets subject to UFTA.

Kapila contends that the interpretation of UFTA should be consistent with its broad purpose of protecting creditors. *See Friedman v. Heart Inst. of Port St. Lucie, Inc.*, 863 So. 2d 189, 191 (Fla. 2003) (noting that the remedies provided for by UFTA "grant a creditor broad relief against the transferee of a fraudulent transfer" (quoting *Friedman v. Heart Inst. of Port St. Lucie, Inc.*, 806 So. 2d 625, 626-27 (Fla. 4th DCA 2002))); *Nat'l Auto Serv. Ctrs., Inc.*, 192 So. 3d at 514 (Villanti, J., concurring) (noting that "the remedial purpose" of UFTA "favors granting a judgment creditor broad relief from fraud"). However, as the language of section 726.102(2)(a) is unambiguous, the remedial purpose of UFTA does not empower this court to rewrite the statute. *See Nat'l Auto Serv. Ctrs., Inc.*, 192 So. 3d at 507 (majority opinion) (holding that a UFTA statutory provision is unambiguous and that "the fact that []UFTA may have a remedial purpose does not empower a reviewing court to rewrite the unambiguous statutory" provision). Kapila argues that this interpretation of UFTA "allows any fraudster to circumvent the statute by passing the distributed funds through a secured account, even for a

10

matter of mere minutes."  "However, the purpose of [UFTA] is not so broad as to cover all instances of fraud or theft."  *Am. Fed. Bank*, 530 F. Supp. 3d at 788.  "If the legislature did not intend the results mandated by the statute's plain language, then the appropriate remedy is for [the legislature] to amend the statute."  *Gordon v. Fishman*, 253 So. 3d 1218, 1220 (Fla. 2d DCA 2018) (quoting *Whitney Bank v. Grant*, 223 So. 3d 476, 479 (Fla. 1st DCA 2017)).

We note that our conclusion that the funds are not an "asset" because they were encumbered by a lien at the time of transfer is consistent with "Florida's longstanding rule that a creditor cannot challenge a conveyance as fraudulent when it could not have reached the subject property had it not been conveyed."  *Branch Banking & Tr. Co. v. Cohen*, Case No.: 8:13-cv-3215-T-24AEP, 2014 WL 12783284, at *5 (M.D. Fla. June 9, 2014) (citing *Dean v. Heimbach*, 409 So. 2d 157, 159 (Fla. 1st DCA 1982)).  If the funds had not been conveyed to CTS and had remained in Holdco's TCB accounts, Kapila could not have reached the funds because they were subject to TCB's lien.

In conclusion, the trial court did not err in ruling as a matter of law that the funds at issue do not qualify as an "asset" subject to Florida's UFTA.  Accordingly, we affirm the final summary judgment entered in favor of CTS.

Affirmed.


KELLY and LaROSE, JJ., Concur.

_____


Opinion subject to revision prior to official publication.

11